El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
En esta ocasión nos corresponde resolver una controversia que trasciende las particularidades fácticas del caso de epígrafe. En esencia, debemos determinar si ciertos terrenos ganados al mar, mediante rellenos realizados en la entrada de la isleta de San Juan a mediados del siglo pasado —sobre los cuales actualmente se erige parte del proyecto de desarrollo mixto comúnmente conocido como Paseo Caribe— son bienes privados o de dominio público.
Al resolver dicha interrogante, tenemos presente que las obras de relleno en controversia formaron parte de una política urbanista promovida por el Estado durante la primera mitad del siglo XX, que resultó en la modificación de una tercera parte del litoral de San Juan y en el asentamiento de diversas zonas históricas del área metropolitana, tales como: Puerta de Tierra, Barrio Obrero, Isla Verde, Sabana, Amelia, Ocean Park, Isla Grande, Juana Matos y el Condado. No cabe duda de que la clasificación dominical, que hoy le otorguemos a las tierras que son objeto de este pleito, tendrá serias consecuencias sobre los derechos propietarios y la seguridad jurídica de las miles de familias que habitan en esas comunidades de San Juan y de otras partes de Puerto Rico con un tracto similar, pues gran parte de éstas también se cimentaron sobre terrenos ganados al mar.
Luego de analizar el derecho aplicable, concluimos que al momento de realizarse los rellenos era suficiente cumplir con un esquema administrativo para la desafectación de los terrenos ganados al mar. Puesto que las agencias competentes autorizaron a título de dominio las obras de relleno realizadas en el Coast Guard Parcel en 1941 y en el Condado Bay Parcel en la década de los cincuenta, resol *527 vemos que dichos predios son bienes patrimoniales susceptibles de una apropiación particular. En vista de que no se deduce de los autos que se presentara prueba sobre error o fraude en la concesión de los permisos correspondientes, y dado que San Gerónimo Caribe Project, Inc. es el titular de los referidos terrenos privados, confirmamos la sentencia dictada por el Tribunal de Primera Instancia.
I
La controversia de autos surgió principalmente como consecuencia de la publicación de la Op. Sec. Just. Núm. 07-130-B de 11 de diciembre de 2007, Consulta Núm. 07-130-B. En esa opinión se concluyó que los terrenos ganados al mar son, como mínimo y desde hace siglos, bienes de dominio público, por lo que no son susceptibles de enajenación sin una autorización legislativa expresa.([1]) En atención a dicha tesis, éste le hizo varias recomendaciones a las agencias concernidas para que reevaluaran todo lo relativo a los permisos otorgados a San Gerónimo Caribe Project, Inc. (SGCP) para la construcción y el desarrollo del proyecto Paseo Caribe.
En vista de las recomendaciones vertidas por el Secretario de Justicia, el 14 de diciembre de 2007 la Junta de Planificación de Puerto Rico (Junta) emitió la Resolución Núm. 99-79-0155-JPU relacionada con la consulta de ubicación sobre el proyecto Paseo Caribe. En dicha resolución, la Junta expresó que, a raíz de la citada opinión del Secretario de Justicia, habían surgido ciertas interrogantes sobre la titularidad de los predios en los que ubica el proyecto. Por consiguiente, dicha agencia ordenó a las partes afectadas que se expresaran sobre la opinión citada en el término de cinco días.
*528 Del mismo modo, la Junta le ordenó al Departamento de Recursos Naturales y Ambientales que realizara y presentara un nuevo deslinde para establecer la zona marítimoterrestre de forma compatible con la nueva interpretación legal del Secretario de Justicia. Por último, le requirió a la Administración de Reglamentos y Permisos (ARPe) que tomara las medidas cautelares necesarias para implantar las recomendaciones de dicho funcionario.
Ese mismo día, ARPe emitió una Orden para Mostrar Causa, dirigida a SGCP. En dicha orden, ARPe dispuso la celebración de una vista en la cual SGCP tendría que “mostrar causa por la cual no se debe dictar una orden dejando en suspenso los permisos y decretando la paralización de las obras de construcción ... por un término de sesenta días”.
Así las cosas, y ante la incertidumbre ocasionada por la citada opinión del Secretario de Justicia y las actuaciones de las agencias administrativas mencionadas, SGCP y First Bank Puerto Rico, Inc. (First Bank) presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda de sentencia declaratoria contra el Estado Libre Asociado de Puerto Rico y otras partes indispensables el 19 de diciembre de 2007. En dicho recurso, SGCP y First Bank —como acreedor de varias hipotecas sobre los bienes en litigio— solicitaron al foro de instancia, entre otras cosas, que declarase que la porción de los terrenos ganados al mar, que está dentro de las fincas regístrales de SGCP con relación al proyecto Paseo Caribe, no son de dominio público.([2])
*529 En oposición, el Estado reprodujo la teoría legal esbozada por el Secretario de Justicia en la referida opinión y sostuvo que los terrenos ganados al mar, en donde radica parte del proyecto Paseo Caribe, son, como mínimo, bienes de dominio público. Asimismo, adujo que todos los actos de dominio ejercidos por el Estado y por las partes sobre dichos predios, adolecen de nulidad, dado que los bienes de dominio público son inalienables, imprescriptibles e inembargables.
Tras la celebración de una vista, las partes presentaron un escrito titulado “Estipulaciones de hechos que no están en controversia”. En dicho documento se estipuló específicamente que las partes coincidían “en que la controversia de umbral a ser resuelta en el caso de epígrafe es si los terrenos ganados al mar objeto de controversia son o no de dominio público, la cual claramente es una controversia de derecho”.
Evaluados los planteamientos de ambas partes, el Tribunal de Primera Instancia dictó sentencia. Al así hacerlo, resolvió que: (1) tanto la porción de terrenos ganados al mar por Estados Unidos para acrecentar al Coast Guard Parcel en 1941, como los terrenos ganados al mar por la Compañía de Fomento Industrial para crear el Condado Bay Parcel en la década de los cincuenta, no son bienes de dominio público, y (2) SGCP y First Bank son terceros regístrales en cuanto a los títulos o las acreencias hipotecarias existentes.
Insatisfecho, y por entender que la sentencia era contraria a derecho al no reconocer el carácter demanial de los terrenos ganados al mar, el Procurador General presentó un escrito de apelación ante el Tribunal de Apelaciones. Acto seguido, SGCP y First Bank presentaron ante nos un recurso de certificación.
Conscientes de la necesidad de una pronta solución al caso, acogimos la solicitud de certificación y concedimos a las partes un término simultáneo para presentar sus respectivos alegatos. De otra parte, y ante una oportuna solicitud para ello, autorizamos la intervención del Instituto de Notariado Puertorriqueño del Colegio de Abogados de Puerto Rico como amicus curiae.
*530 Con el beneficio de la comparecencia de las partes y del amicus curiae, procedemos a resolver la controversia ante nuestra consideración.
II
De entrada, y para atender con el cuidado requerido esta controversia, es menester examinar el trasfondo histórico y registral de los terrenos en donde ubica el proyecto Paseo Caribe, a saber, los predios conocidos desde media-dos del siglo pasado como el Coast Guard Parcel y el Con-dado Bay Parcel.
Como asunto de umbral, debemos determinar la naturaleza y la evolución del estado de derecho con relación a los terrenos sumergidos que fueron rellenados y, por ende, ganados al mar para la fecha cuando éstos fueron objeto de compraventas y de transacciones de dominio, tanto por el gobierno de Estados Unidos como por el Estado Libre Asociado de Puerto Rico. El análisis de los antecedentes históricos sobre la titularidad de tales predios nos permitirá determinar si la controversia ante nos debe resolverse conforme al derecho federal, al derecho puertorriqueño o a los preceptos del derecho de propiedad de ambos sistemas jurídicos. Veamos.
 Como es sabido, España y Estados Unidos de América suscribieron el Tratado de París para dar fin a la Guerra Hispanoamericana en diciembre de 1898. Según el Art. VIII del Tratado, todos los terrenos, propiedades y bienes patrimoniales de la Corona Española en Puerto Rico, así como “los demás bienes inmuebles que con arreglo a derecho son de dominio público”, fueron adquiridos por el Gobierno de Estados Unidos. (Enfasis suplido.) Art. VIII, Tratado de París, Documentos Históricos, L.P.R.A., Tomo 1, ed. 2008, pág. 19. Véase, además, Pueblo v. Del Valle, 60 D.P.R. 184, 192 (1942).
En ocasiones anteriores hemos señalado también *531 que al momento de la firma del Tratado de París todas las aguas navegables de Puerto Rico, al igual que los terrenos sumergidos bajo éstas, eran bienes sujetos a la soberanía de la Corona Española con arreglo al estado de derecho español. El Pueblo v. Dimas et al., 18 D.P.R. 1061 (1912); Art. 339.1 del Código Civil español de 1889; Art. 1 de la Ley de Puertos de 1880, Colección Legislativa de España, Madrid, Ed. Imprenta Nacional, 1881, T. 124 (2da parte), pág. 787. Por lo tanto, las tierras sumergidas —incluyendo las que luego fueron objeto de relleno en el supuesto de las parcelas en controversia— pasaron al control y dominio de Estados Unidos por mandato expreso del Tratado de París. Este, a su vez, surtió el mismo efecto con respecto al Fortín San Jerónimo del Boquerón([3]) y sus terrenos colindantes, pues éstos pertenecían también a la Corona Española.([4])
Ahora bien, el 12 de abril de 1900, el Congreso de Estados Unidos aprobó la Ley Foraker para establecer un gobierno civil en Puerto Rico. 31 Stat. 77, Documentos Históricos, L.P.R.A., Tomo 1. En lo pertinente, la Sec. 13 de dicha ley dispuso que algunas de las propiedades adquiridas por Estados Unidos mediante el Tratado de París —como los puentes y las carreteras— quedaban “bajo la dirección” del gobierno insular establecido para ser “administrados a beneficio de El Pueblo de Puerto Rico”. No obstante, la referida sección específicamente excluía de tal en *532 trega jurisdiccional “la superficie de los puertos o aguas navegables”. (Énfasis suplido.) Sec. 13 de la Ley Foraker, supra, pág. 35.([5])
De esta manera, los terrenos sumergidos en aguas navegables o en las bahías —que claramente eran bienes sujetos a la soberanía de la Corona bajo el régimen colonial español— continuaron bajo la administración y el dominio exclusivos del gobierno federal tras la aprobación de la Ley Foraker. Director I.C.P. v. Fitzgerald, etc., 130 D.P.R. 46, 57 (1992). Dicha ley tampoco le transfirió al Pueblo de Puerto Rico la titularidad sobre el Fortín San Jerónimo del Boquerón ni sobre los predios colindantes a éste, por lo que el Gobierno de Estados Unidos mantuvo su dominio sobre ellos.
Posteriormente, el 1 de julio de 1902 el Congreso aprobó una ley que autorizaba al Presidente de Estados Unidos a declarar reservas de tierras y de edificios públicos pertenecientes al gobierno federal en Puerto Rico, para los propósitos que éste considerara necesarios, en el término de un año de su aprobación. Public Law No. 249, 32 Stat. 731 (Ley de 1902). Además, ese estatuto dispuso que todos los terrenos y edificios públicos pertenecientes al gobierno federal en Puerto Rico, no reservados por el Presidente de Estados Unidos bajo la autoridad de la referida ley, y sin incluir las bahías o aguas navegables y las tierras sumergidas bajo éstas, serían transferidos al gobierno insular para su uso y administración a favor del Pueblo de Puerto Rico.([6]) Rubert Armstrong v. E.L.A., supra, pág. 603; El Pueblo v. Dimas et al., supra, pág. 1074.
*533 En su parte operativa, la Sec. 1 de dicha ley dispuso lo siguiente:
Be it enacted ... [t]hat the President be, and he is hereby, authorized to make, within one year after the approval of this Act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico, for military, naval, light-house, marine-hospital, post-offices, customhouses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the People of said island. ... (Énfasis suplido.) Sec. 1 de la Ley de 1902, supra.
Como se puede apreciar, dicho estatuto impedía expresamente que la titularidad de las bahías, las aguas nave-gables y las tierras sumergidas bajo éstas, se transfiriera al Gobierno de Puerto Rico.
Según la autoridad conferida por la Ley de 1902, el 30 de junio de 1903 el presidente Theodore Roosevelt emitió varias proclamas y órdenes ejecutivas que reservaron un sinnúmero de terrenos y edificios públicos en todo Puerto Rico para propósitos militares y navales del gobierno federal. En particular, la Orden Ejecutiva de 30 de junio de 1903 estableció la Reserva Militar Principal o la Reserva Militar de San Juan. Véase Orden General Núm. 97, 7 de julio de 1903. Dicha reserva comprendía todos los predios del litoral de la isleta de San Juan —y en lo pertinente a los terrenos en controversia— desde el Morro hasta el Fortín San Jerónimo del Boquerón hacia el este, y desde el canal San Antonio hasta la Laguna del Condado hacia el norte. Surge de los autos que dicha reserva incluía los terrenos en los que hoy enclavan el Fortín San Jerónimo del Boquerón, el Hotel Caribe Hilton y, por lo menos, una por *534 ción significativa del proyecto Paseo Caribe, además de otros edificios contiguos.([7])
Años más tarde, específicamente el 2 de marzo de 1917, el Congreso aprobó la segunda ley orgánica para Puerto Rico, comúnmente conocida como la Ley Jones. Ley Púb. Núm. 368, 39 Stat. 951, Documentos Históricos L.P.R.A., Tomo 1. Véase Director I.C.P. v. Fitzgerald, etc., supra. La See. 7 de la referida ley es idéntica a la Sec. 13 de la Ley Foraker, con la excepción de que dispuso que todas las tierras y los edificios públicos del gobierno federal en Puerto Rico que aún no se habían reservado hasta ese momento y que no se habían transferido a la administración del Gobierno de Puerto Rico por mandato de la Ley Foraker o de la Ley de 1902, se trasladarían desde su aprobación al control del gobierno insular. Por otro lado, la See. 8 de la Ley Jones, supra, pág. 81, ordenó la transferencia de “[l]a superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellas dentro y alrededor de la Isla de Puerto Rico y de las islas y aguas adyacentes que ahora pertenecen a los Estados Uni- *535 dos y no han sido reservados por los Estados Unidos para fines públicos”.([8]) Véase León v. Transconex, Inc., 119 D.P.R. 102 (1987).
Desde el cambio de soberanía en los últimos años del siglo XIX, Estados Unidos ocupó, en calidad de dueño, los terrenos que luego se identificaron como la Reserva Militar de San Juan. Como mencionamos anteriormente, esta reserva federal incluía todos los terrenos aledaños al litoral nororiental de la isleta de San Juan y al Fortín San Jerónimo del Boquerón, incluyendo, por lo menos, una porción significativa de los terrenos en donde actualmente radica el proyecto Paseo Caribe. Por tanto, la Ley Jones no alteró el dominio del Gobierno de Estados Unidos sobre éstos.
Estos predios estuvieron bajo el control del Departamento de Guerra de Estados Unidos hasta diciembre de 1919, cuando se traspasaron al Departamento de la Marina y se redesignaron como la Reserva Naval San Jerónimo. Posteriormente, la Marina cedió en arrendamiento una parte de esas tierras —incluyendo el fortín San Jerónimo del Boquerón y los terrenos colindantes que fueron objeto de la controversia— al entonces retirado teniente comandante de la Marina Virgil Baker, dado que dicho departamento ya no las necesitaba para sus propósitos navales. El contrato de arrendamiento estipulaba un término de novecientos noventa y nueve años y contenía una condición a los efectos de que se hacía “pending complete transfer by Congress of title to the Lessee, which *536 transfer needs the approval of the Navy Department”. Véase el Exhibit Estipulado Núm. 1, Ap. Vol. I.([9])
Según la Ley Pública Núm. 35 aprobada por el Congreso federal el 12 de julio de 1921, se otorgó el contrato de arrendamiento entre Estados Unidos y el señor Baker. Este contrato estipulaba unos lindes y rumbos frente al litoral de la isleta de San Juan que expresamente incluían terrenos sumergidos. Véase el Exhibit Estipulado Núm. 2, Ap. Vol. I. De otra parte, la Reserva Naval San Jerónimo se inscribió en el Registro de la Propiedad en diciembre de 1921 a nombre de Estados Unidos. El contrato de arrendamiento a favor del señor Baker se inscribió posteriormente en el Registro.([10])
Ahora bien, la bifurcación en el tracto dominical de las dos parcelas, objeto de las controversias, comenzó en agosto de 1929, cuando el Presidente de Estados Unidos emitió la Proclama Núm. 1889 al amparo de la See. 7 de la Ley Jones, supra. Mediante esta orden ejecutiva, el presidente Herbert Hoover traspasó al Pueblo de Puerto Rico todo derecho, título e interés de Estados Unidos sobre ciertos terrenos, in *537 cluyendo algunos de los predios arrendados al señor Baker.([11])
No obstante, la Proclama Presidencial de 1929 específicamente retenía y reservaba cinco acres de los terrenos antes mencionados para el uso del Departamento de la Marina en el desarrollo de los servicios de comunicación, constituyendo una nueva reserva de los terrenos que actualmente se conocen como el Coast Guard Parcel, finca que se mantuvo bajo el dominio del gobierno federal hasta 1991. Por otro lado, desde que se emitió la Proclama Presidencial de 1929 no hay duda de que el dominio de los predios restantes de la Reserva Naval San Jerónimo, incluso los terrenos sumergidos en los referidos puntos de las fincas que hoy forman parte del Condado Bay Parcel, fue transferido al Gobierno de Puerto Rico. Veamos detenidamente.
A. Coast Guard Parcel
En diciembre de 1940, como parte de unas obras de mejoras al Coast Guard Parcel, la Marina de Estados Unidos presentó ante la Comisión de Servicio Público y el Departamento de Interior de Puerto Rico una solicitud para llevar a cabo unos trabajos de relleno en los terrenos sumergidos adyacentes a la costa de dicha parcela. En particular, se solicitó permiso para rellenar una zona de la Laguna del Condado, consistente de cuatrocientos cincuenta pies de largo, doscientos pies de ancho y seis pies sobre el nivel mínimo del mar, según su flujo y reflujo (mean low water). Tras obtener los permisos necesarios de las mencionadas agencias insulares y del Departamento de Guerra de Estados Unidos, la Marina rellenó aproximadamente 1.92 cuer *538 das de terrenos sumergidos frente al Coast Guard Parcel. Según estipularon las partes, dichas obras concluyeron en octubre de 1941 conforme a los planos del permiso.([12])
Durante el transcurso de cincuenta años, el gobierno federal poseyó ininterrumpidamente y en calidad de dueño los terrenos ganados al mar que acrecentaron el Coast Guard Parcel.([13]) En noviembre de 1991, la Administración de Terrenos del Estado Libre Asociado de Puerto Rico y la Administración de Servicios Generales de Estados Unidos otorgaron un contrato de compraventa. En dicho contrato, el Gobierno de Puerto Rico adquirió, a título oneroso, los terrenos del Coast Guard Parcel. ([14]) Dicha transacción jurídica incluía claramente los terrenos ganados al mar que son objeto de controversia, pues describía su área limítrofe al este, como la Laguna del Condado.([15])
En diciembre de 1992, la Junta de Planificación y el Gobernador de Puerto Rico aprobaron el Plan de Usos de Terreno y el Reglamento Núm. 4918 de Zonificación Espe *539 cial para la entrada de la Isleta de San Juan. Reglamento de Planificación Núm. 23. Este reglamento cambió la zonificación del Coast Guard Parcel a una Zona de Desarrollo Especial, permitiendo allí un área bruta de construcción de 60,350 metros cuadrados. Para incentivar el desarrollo incremental de dicha zona, se permitió la subdivisión de las parcelas en solares más pequeños. En septiembre de 1998 la Administración de Terrenos de Puerto Rico adoptó una resolución en la que aprobó la venta del Coast Guard Parcel al Hotel Development Corporation, una corporación creada al amparo de las leyes de Puerto Rico y cuyo único accionista es la Compañía de Turismo.
B. Condado Bay Parcel
Por otro lado, la porción restante de los terrenos ganados al mar, en controversia, se encuentra en el Condado Bay Parcel. Esta parcela se rige plenamente por el derecho puertorriqueño, pues es un hecho incontrovertible que tanto los terrenos sumergidos que se rellenaron para for-mar el Condado Bay Parcel en la década de los cincuenta como los terrenos costeros colindantes ya le pertenecían al Gobierno de Puerto Rico.
Como mencionamos en la parte II de esta opinión, mediante la Proclama Presidencial Núm. 1889 de 1929, el gobierno federal traspasó al gobierno insular de Puerto Rico todo título, derecho e interés sobre los terrenos de la Reserva Naval San Jerónimo, incluyendo los predios que formaban parte del arrendamiento del señor Baker. En enero de 1947, San Gerónimo Development Company, una corporación propiedad del señor Baker, subarrendó a la Compañía de Fomento Industrial de Puerto Rico una parcela de sus terrenos por los restantes años del arrendamiento original para la construcción del hotel Caribe Hilton. Esta finca subarrendada por la Compañía de Fomento Industrial colindaba —pero no incluía— los terrenos del litoral en el que *540 enclava el Fortín San Jerónimo del Boquerón,([16]) por lo que el Gobierno de Puerto Rico presentó una demanda de expropiación contra el señor Baker en noviembre de 1949 para adquirirlos.
La “Declaración de adquisición y entrega material de la propiedad”, que se presentó junto a la demanda, describía la propiedad objeto de la expropiación, la cual expresamente incluía 6,949.1923 metros cuadrados de tierras sumergidas y 3,360.448 metros cuadrados de tierra firme. Véase el Exhibit Estipulado Núm. 16, Ap. Vol. I. Es decir, más de dos terceras partes de los predios, objeto de expropiación en aquel momento, eran terrenos sumergidos. Luego de llevar a cabo estas transacciones, el Gobierno procedió a inscribir los terrenos en el Registro de la Propiedad a título de dominio a favor del Estado Libre Asociado de Puerto Rico.
Compatible con la política pública de planificación urbana dirigida por el Estado Libre Asociado en aquella época, la Compañía de Fomento Industrial presentó en la década de los cincuenta una consulta de ubicación ante la Junta de Planificación para realizar unas obras de relleno en los terrenos sumergidos del área expropiada y subarrendada al señor Baker, con el propósito ampliar las instalaciones del Hotel Caribe Hilton. Véase Op. Sec. Just, de 25 de noviembre de 1970 (no publicada), pág. 8. Mediante un informe de la Junta adoptado en junio de 1955, se aprobó la consulta para la construcción de dicha ampliación y la constitución de la parcela rellenada que hoy se conoce como el Condado Bay Parcel. Así, pues, se realizaron los rellenos y las obras de mejoras del Hotel Caribe Hilton, según los permisos concedidos por las autoridades gubernamentales.
En abril de 1959, el entonces Secretario de Obras Públicas de Puerto Rico, Hon. Roberto Sánchez Vilella, emitió *541 una certificación para solicitar la inscripción en pleno dominio ante el Registro de la Propiedad de una parcela de terreno en el área entre el fortín y los terrenos del Caribe Hilton, la cual incluía ciertos terrenos ganados al mar que formaban parte del Condado Bay Parcel.([17]) Ese mismo mes, dicho funcionario —como gobernador interino de Puerto Rico— emitió una orden ejecutiva en la cual autorizó el traspaso gratuito de dicha parcela a favor de la Compañía de Fomento Industrial. En vista de ello, en diciembre de 1961 Sánchez Vilella, en su capacidad de Secretario de Obras Públicas, otorgó una escritura de traspaso de la parcela a favor de la Compañía de Fomento Industrial, la cual aclaraba que tales terrenos fueron ganados al mar por el Estado Libre Asociado de Puerto Rico, y que se utilizarían para el desarrollo de la industria del turismo.
Esta parcela fue inscrita como la Finca Núm. 439 en el Registro de la Propiedad, Sección de San Juan. Desde entonces, la Compañía de Fomento Industrial fue el titular del mencionado terreno, pero la porción rellenada que formaba parte del Hotel Caribe Hilton fue administrada por la cadena de hoteles Hilton en virtud de un contrato de arrendamiento. En lo referente al caso, parte del proyecto Paseo Caribe, y los demás proyectos relacionados con éste, también ocupan hoy una porción de esos terrenos ganados al mar.
En octubre de 1992, los derechos de la Compañía de Fomento Industrial, bajo el contrato de subarrendamiento de los predios en donde enclava el Hotel Caribe Hilton, fueron cedidos a Hotel Development Corporation. En octubre de 1998, el entonces Secretario de Transportación y Obras Públicas, Hon. Carlos Pesquera Morales, expidió una certificación a los efectos de que el Estado Libre Asociado de Puerto Rico era el dueño de dos parcelas aledañas *542 a los terrenos de la Administración de Terrenos y al Hotel Caribe Hilton que formaban parte del Condado Bay Parcel y que eran, a su vez, “terrenos adquiridos del Mar”. Véase el Exhibit Estipulado Núm. 40, Ap. Vol. I.([18])
En vista de ello, dicho funcionario solicitó ante el Registro de la Propiedad la inscripción a título de dominio de tales parcelas, compuesta de terrenos rescatados del mar mediante los rellenos realizados en la década de los cincuenta por el Gobierno de Puerto Rico. El mes siguiente, y mediante una autorización del gobernador Pedro Rosselló González conforme al Art. 10 de la Ley Núm. 10 de 18 de jimio de 1970 (23 L.P.R.A. sec. 671(m)), dicha parcela fue cedida a la Compañía de Turismo de Puerto Rico para que dicha corporación pública “utilice, administre y disponga conforme a los poderes conferídoles por ley y de acuerdo a los mejores intereses de Puerto Rico”. Véase el Exhibit Estipulado Núm. 41, Ap. Vol. I.
C. Integración del Coast Guard Parcel y del Condado Bay Parcel
En noviembre de 1998, y luego de varios trámites administrativos, Hotel Development Corporation vendió a Hilton International of Puerto Rico, Inc. (Hilton International) el Coast Guard Parcel, el Condado Bay Parcel y la Finca Núm. 439, transacción que fue inscrita en el Registro de la Propiedad. Así las cosas, en julio de 2000 Hilton International vendió el Coast Guard Parcel a SGCP, mediante una escritura de compraventa inscrita en el Registro de la Propiedad. Poco antes, mediante una resolución dictada en enero de 2000, la Junta de Planificación aprobó la consulta de ubicación para un proyecto mixto residencial, comercial y turístico propuesto por SGCP para estos terrenos.
*543 En dicho negocio jurídico, el desarrollador asumió las obligaciones pactadas entre Hotel Development Corporation y Hilton International. A su vez, mediante otra escritura de compraventa otorgada ese mismo día, Hilton International le vendió a SGCP una nueva finca resultante de la agrupación del remanente de dos parcelas segregadas, a saber, del Condado Bay Parcel y de la Finca Núm. 439. Luego de varias segregaciones que constan inscritas o presentadas en el Registro de la Propiedad —incluso la segregación de una parcela identificada como Camino de Acceso al Fortín — ([19]) ARPe expidió varios permisos de construcción y de uso para distintos componentes del proyecto Paseo Caribe. A su vez, SGCP constituyó hipoteca sobre los referidos proyectos a favor de First Bank.
D. Derecho federal “vis-á-vis” derecho civil puertorriqueño
Ante la realidad táctica de que el Gobierno de Estados Unidos era el dueño del Coast Guard Parcel desde el cambio de soberanía en 1898 hasta su compraventa por el Gobierno de Puerto Rico en 1991, no cabe duda que los rellenos realizados por la Marina en 1941 en esta parcela se deben examinar desde la óptica del derecho federal. Ello es así, independientemente de quién fuera el titular de los terrenos sumergidos que fueron rellenados posteriormente, pues el Tribunal Supremo federal ha resuelto que cualquier disputa o controversia sobre terrenos costeros —o cercanos al mar— que sean propiedad del Gobierno de Estados Unidos se regirá por el derecho federal. Véanse: Ca *544 lifornia ex rel. State Lands Comm’n v. U.S., supra; Hughes v. Washington, 389 U.S. 290 (1967); Borax Consolidated Ltd. v. Los Angeles, 296 U.S. 10 (1935).
Por otro lado, es evidente que la Proclama Presidencial Núm. 1889 de 1929 cedió todo título sobre los predios donde hoy ubican el hotel Caribe Hilton, el Fortín San Jerónimo del Boquerón y las fincas colindantes a favor del Gobierno de Puerto Rico, incluso los terrenos contiguos al Condado Bay Parcel. Por lo tanto, es menester concluir que la controversia en torno a la titularidad de los terrenos ganados al mar que forman parte de dicha parcela se debe analizar según el derecho civil puertorriqueño vigente para la fecha cuando la Compañía de Fomento Industrial realizó las obras de relleno.
En vista de la divergencia histórica en el tracto dominical de ambas parcelas, a continuación examinamos de manera cronológica el desarrollo doctrinal y normativo sobre los terrenos ganados al mar bajo el sistema legal aplicable a cada una.
III
En primer lugar, debemos tener presente que el Gobierno de Estados Unidos era el titular del Coast Guard Parcel al momento cuando se realizaron las obras de relleno en controversia. Por lo tanto, como mencionamos, es evidente que la titularidad de los terrenos previamente sumergidos adyacentes a dicha parcela costera —los cuales fueron rellenados por el Departamento de la Marina en 1941— debe examinarse conforme al derecho común federal. California ex rel. State Lands Comm’n v. U.S., supra; Hughes v. Washington, supra. Véase, además, Roberts v. U.S.O. Council of P.R., 145 D.P.R. 58 (1998).
En vista de lo anterior, y ante la ausencia de legislación federal que atienda expresamente el asunto de la titularidad de los terrenos ganados al mar por particulares o por el propio Gobierno, debemos acudir a la doctrina jurisprudencial para atender la controversia. En Alexander Hamil *545 ton Life Ins. Co. v. Govt. of V.I., 757 F. 2d 534 (3er Cir. 1985), el Tribunal de Apelaciones de Estados Unidos para el Tercer Circuito discutió cabalmente el esquema normativo y doctrinal del derecho común anglosajón con relación a los terrenos ganados al mar mediante rellenos artificiales.
En ese caso, el foro apelativo federal tuvo ante su consideración una disputa en torno a la titularidad de ciertos terrenos ganados al mar mediante el relleno de tierras sumergidas, y concluyó que el propietario costero adquiere el título sobre el terreno ganado al mar cuando la obra de relleno se lleva a cabo con la debida autorización gubernamental:
“Where the reclamation and filling of the adjacent shore or submerged soil was expressly permitted by legislative enactment, or was authorized by a statute fixing a bulkhead, harbor, or dock line, or similar statute, or by a valid license or permit, or by local common law, it has usually been held or recognized that filled land created by a riparian or littoral proprietor belongs to him as part of the upland, at least where the public rights with respect to navigation and commerce are not substantially impaired. (Énfasis suplido.) Alexander Hamilton Life Ins. Co. v. Govt. of V.I., supra, pág. 546, citando a B.H. Glenn, Rights to land created at water’s edge by filling or dredging, sección 2(b) 91 A.L.R. 2d 857, 867. Véanse, además: United States v. Groen, 72 F. Supp. 713 (D. D.C. 1947). Providence Chamber of Commerce v. State, 657 A.2d 1038 (1995).([20])
Más aún, dicho foro federal expresó en ese caso que la regla relativa a la adquisición del título sobre los terrenos ganados al mar tras mediar autorización para el relleno se ha aplicado incluso en ausencia de un lenguaje expreso a esos efectos, pues se estima que la autorización gubernamental previa crea una expectativa de que se reconocerá la titularidad de los terrenos reclamados, sobre la cual el pro *546 pietario que realiza el relleno debe poder confiar. Alexander Hamilton Life Ins. Co. v. Govt. of V.I., supra.
De otra parte, según el derecho común anglosajón, el propietario de un terreno bordeado por la costa puede tener derecho a “reclamar” las tierras sumergidas bajo el mar circundante en circunstancias determinadas. Sin embargo, ello no implica que un propietario pueda rellenar arbitrariamente terrenos sumergidos que no estén bajo su dominio con el propósito de extender los lindes de su propiedad. Reid v. State, 373 So.2d 1071 (1979). Véase Board of Tr. of Int. Imp. Tr. F. v. Bankers Life & Co., 331 So.2d 381 (1976). Por lo tanto, la titularidad sobre los terrenos sumergidos permanece inalterada si éstos son rellenados por un particular sin la autorización correspondiente. Véase City of Newport Beach v. Fager, P.2d 438 (Cal. 1940).
Asimismo, el Estado puede conceder su autorización para el relleno de los terrenos sumergidos mediante su derecho dominical sobre éstos. De esa forma, si un particular rellena de acuerdo con una autorización gubernamental, de ordinario, las porciones de terrenos reclamados pasan a formar parte integral del predio colindante y el título corresponderá a su titular. Véanse: Ward Sand & Materials Co. v. Palmer, 237 A.2d 619 (1968); O’Neill v. State Highway Dept., 235 A.2d 1 (1967); Mallon v. City of Long Beach, 282 P.2d 481 (Cal. 1955).
En casos similares al que hoy nos ocupa, bajo el derecho común se ha resuelto que, previa autorización gubernamental, el propietario del lote bordeado por el mar y del terreno sumergido adyacente a éste puede rellenar válidamente ese terreno para “reclamarlo” y habilitarlo como parte del predio no sumergido. Sin embargo, la obra de relleno no puede interferir con las facultades sobre la navegación y el comercio que poseen tanto el gobierno federal como los estados. Véase People v. Broedell, 112 N.W.2d *547 517 (1961).([21]) Así las cosas, es evidente que, según el derecho común angloamericano, el propietario de un terreno contiguo al mar que rellena con permiso del Estado los terrenos sumergidos adyacentes a su propiedad, tiene derecho a la titularidad sobre el terreno ganado al mar. Véase, e.g. Providence Chamber of Commerce v. State, 657 A.2d 1038 (1995).
Dicha norma es claramente aplicable a la controversia de autos en lo relativo al Coast Guard Parcel. Se desprende del expediente que el gobierno federal obtuvo todos los permisos necesarios para rellenar los terrenos sumergidos contiguos a la parcela. Para realizar dichas obras, el Gobierno estadounidense solicitó, no sólo la autorización del Departamento de Guerra,([22]) sino también el permiso de la Comisión de Servicio Público y del Departamento del Interior de Puerto Rico. Concedidos tales permisos, el gobierno federal procedió a realizar diversos actos de dominio sobre el lote conocido hoy como el Coast Guard Parcel. A la luz de estos hechos, resulta forzoso concluir que como propietario de los predios aledaños a los terrenos sumergidos, el gobierno federal advino titular de las tierras ganadas al mar mediante las obras de relleno realizadas por la Marina estadounidense.
De otra parte, ninguno de los permisos otorgados expresaba reserva o prohibición alguna que privara a Estados Unidos de adquirir la titularidad de los nuevos predios rellenados. Por lo tanto, es meritorio concluir que al momento cuando tales terrenos fueron ganados al mar en el “Coast Guard Parcel”, éstos pasaron a ser propiedad patri *548 monial del Departamento de la Marina de Estados Unidos en conformidad con el derecho común federal.
IV
Examinado el derecho federal con relación al Coast Guard Parcel, nos corresponde dilucidar la controversia en torno a la titularidad de los demás terrenos ganados al mar que forman parte de las fincas regístrales de SGCP. Como indicamos anteriormente, la controversia en torno al Condado Bay Parcel se debe resolver exclusivamente al amparo del Derecho puertorriqueño, pues los terrenos objeto de controversia ya se encontraban bajo la soberanía del Estado Libre Asociado de Puerto Rico para la fecha cuando se realizaron los rellenos con el objetivo de ampliar las instalaciones del Hotel Caribe Hilton. Por consiguiente, a continuación examinamos el desarrollo doctrinal y normativo de los terrenos sumergidos y los terrenos ganados al mar en el ordenamiento civilista puertorriqueño.
A. Sabido es que el estado de derecho puertorriqueño, en referencia a la clasificación jurídica de los bienes relacionados al litoral y a la zona marítimoterrestre, tuvo su antesala moderna en la Ley de Aguas española de 3 de agosto de 1866. Esta legislación especial, extendida a Puerto Rico por la Real Orden de 8 de agosto de 1866, disponía en su Art. 1 que serían bienes de dominio nacional y de uso público: (1) las costas o fronteras marítimas del territorio español, con sus obras, ensenadas, calas, radas, bahías y puertos; (2) el mar litoral o la zona marítima que ciñe las costas, en toda la anchura determinada por el derecho internacional, y (3) las playas.([23]) Colección Legislativa de España, Madrid, *549 T. XCVI (Segunda Parte), 1866, págs. 294-346; Rubert Armstrong v. ELA, supra, pág. 625.
Por otro lado, los Arts. 4 y 5 de la referida ley articulaban un claro reconocimiento de la posibilidad de que existiera propiedad privada en los terrenos ganados al mar e, incluso, en lo que actualmente se conoce como la zona marítimo-terrestre. En particular, el Art. 5 de la Ley de Aguas española proveía que “[l]os terrenos ganados al mar por consecuencia de obras construidas por el Estado o por las provincias o pueblos o particulares competentemente autorizados serán de propiedad de quien hubiese construido las obras, a no haberse establecido otra cosa en la autorización”. (Énfasis suplido.([24]) Es decir, se reconocía la posible patrimonialidad de los terrenos ganados al mar.
Dicha ley rigió en Puerto Rico hasta el 5 de febrero de 1886, cuando por Real Orden se extendieron a Puerto Rico la Ley de Aguas de 13 de junio de 1879 y la Ley de Puertos española de 7 de mayo de 1880. La Ley de Aguas de 1879 sustituyó a la Ley de Aguas española de 1866 sólo en cuanto a las aguas terrestres. Con relación a las aguas marítimas, y en lo pertinente al caso de autos, la Ley de Aguas de 1866 fue sustituida por la Ley de Puertos para la isla de Puerto Rico de 1886. Colección Legislativa de España, Madrid, T. CXXXVI (segunda parte), 1887, págs. 436-448. Véase Rubert Armstrong v. E.LA., supra, pág. 623.
La Ley de Puertos de 1886 introdujo en nuestro ordenamiento el concepto jurídico de la “zona marítimoterrestre”. Ésta dispuso, en su Art. 1, que “son de dominio nacional y público, sin peijuicio de los derechos que correspondan a los particulares” la zona marítimo-terrestre y el mar litoral o la zona marítima que ciñe las costas de la isla. *550 En efecto, la clasificación de dominio nacional y el uso público de los mismos bienes que se enumeraban en el Art. 1 de la derogada Ley de Aguas española de 1866, se mantuvo prácticamente inalterada. Este artículo definía la “zona marítimo-terrestre” como “el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde no lo sean”. íd. Por lo tanto, la única diferencia práctica entre la declaración demanial establecida por ambas legislaciones españolas al respecto es que la Ley de Puertos de 1886 sustituía el término “playa” por “zona marítimo-terrestre”. E. Desdentado Daroca, La expropiación de los enclaves privados en el litoral, Madrid, Ed. Thomson-Civitas, 2007, pág. 26.
A su vez, la legislación española estableció en su Art. 2 que los terrenos que se unieran a la zona marítimo-terrestre por las accesiones y los aterramientos que ocasionara el mar continuarían en el dominio nacional y uso público.([25]) Mientras que el Art. 4 de la derogada Ley de Aguas de 1866 disponía que el Estado podía declarar las nuevas formaciones como propiedad de los dueños de las líneas colindantes, el mencionado Art. 2 de la Ley de Puertos de 1886 establecía que,
[c]uando por consecuencia de estas accesiones, y por efecto de retirarse el mar, la línea interior que limita la expresada zona avance hacia aquél, los terrenos sobrantes de lo que era la antigua zona marítimo-terrestre, pasarán a ser propiedad del Estado, previo al oportuno deslinde por el Ministerio de Ultra-mar, de acuerdo con el de Marina; y el primero podrá enajenarlos cuando no se consideren necesarios para servicios marítimos u otros de utilidad pública. (Enfasis suplido.)
Es decir, la Ley de Puertos de 1886 reconocía el posible carácter patrimonial y la susceptibilidad enajenable de los terrenos que previamente se encontraban en la zona marítimo-terrestre. Al declarar estos terrenos como propiedad enajenable del Estado, la propia ley dispuso la clasifi *551 catión, patrimonial mediante la desafectación natural de irnos terrenos antes ocupados por las aguas. De otra parte, esta legislación decimonónica reconoció la existencia de enclaves privados en la zona marítimo-terrestre por vía excepcional, dado que claramente establecía que sus efectos serían sin peijuicio de los derechos que correspondan a los particulares.([26]) Véase Rubert Armstrong v. E.LA., supra, págs. 622-623; Exposición de Motivos de la Ley de Aguas española de 1866. Véase, además, Desdentado Daroca, op. cit., págs. 24-34.
Más aún, la Ley de Puertos de 1886 claramente dispone en su Art. 7 que “[l]os terrenos de propiedad particular colindantes con el mar o enclavados en la zona marítimo-terrestre, están sometidos a la servidumbre de salvamento y de vigilancia litoral”. (Énfasis suplido.) Nuevamente, el ordenamiento clasiñcatorio establecido por dicha legislación especial reconoce la posibilidad de ostentar propiedad privada sobre terrenos que, de ordinario, se considerarían como bienes de dominio público. De hecho, este Tribunal estableció en Rubert Armstrong v. E.L.A., supra, pág. 630, que los manglares o marismas de la zona marítimo-terrestre no son, por su sola condición de manglares, “bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres”. En ese caso, luego de examinar las referidas legislaciones especiales, reconocimos la posibilidad de que *552 exista la propiedad y el título particular sobre dichos bienes en determinadas circunstancias.
De otra parte, el Cap. VI de la referida Ley de Puertos —titulado “De las obras construidas por particulares”— estableció un esquema administrativo que claramente reconoce la posibilidad de realizar obras permanentes a título particular en terrenos que en otros supuestos podrían considerarse como enclavados en la zona marítimo-terrestre o como bienes de dominio nacional y público. Por ejemplo, el Art. 38 establece que “[e]n ningún punto de las costas, playas, puertos y desembocaduras de los ríos, ni en las islas formadas en la zona marítima, se podrán ejecutar obras nuevas, de cualquier especie que fueren ni construirse edificio alguno sin la competente autorización con arreglo a lo establecido en esta Ley”. (Enfasis suplido.([27])
Asimismo, y en lo pertinente a este caso, resulta reveladora la única mención que hizo la Ley de Puertos de 1886 en cuanto a los terrenos ganados al mar. El Art. 57 de la referida ley dispuso que
[e]n las concesiones de obras en los puertos con los cuales se ganen terrenos al mar, se exceptuará siempre de los que se reconozcan de propiedad del concesionario la parte necesaria para la zona de servicio a que se refiere el artículo 34, la cual quedará propiedad del Estado. (Énfasis suplido.)
Como se puede apreciar, la intención legislativa que se colige del artículo es excluir de la propiedad particular de *553 un individuo el espacio necesario para proveerle servicio a los buques, pues los puertos se consideraban como bienes de dominio público en virtud de la misma ley. Art. 4 de la Ley de Puertos de 1886.
Dicha salvedad establecida para los terrenos ganados al mar en los puertos era precisamente la excepción a la regla general que establecía el Art. 2 de la Ley de Aguas española de 1866 y que se reiteró mediante la Real Orden de 20 de agosto de 1883. Esta disponía para la atribución de la propiedad de los terrenos ganados al mar a quien hubiere realizado las obras de relleno o de desecación con el permiso correspondiente. Esta orden, decretada de forma aclaratoria después de la aprobación de la Ley de Puertos española de 1880, establecía que los terrenos ganados al mar litoral fuera de los puertos con obras construidas por el Estado o particulares competentemente autorizados para ello, serían propiedad de la entidad que los hubiere llevado a cabo. Colección Legislativa de España, Madrid, 1884, T. 131, pág. 398.
Para atender la falta de regulación específica de la Ley de Puertos de 1886 en cuanto a los terrenos ganados al mar fuera de los puertos, y según el Art. 2 del Real Decreto que extendió esta legislación a Puerto Rico, el Ministro de Ultramar dictó una instrucción que calcó, en esencia, el mismo texto de la Real Orden antes citada. Colección Legislativa de España, Madrid, 1887, 2da parte, T. 136, pág. 1124. El Art. 22 de dicha instrucción disponía:
Los terrenos ganados al mar litoral fuera de los puertos con obras construidas por el Estado, las provincias, los Municipios o los particulares, competentemente autorizados serán de propiedad de la entidad que los hubiere llevado a cabo. (Enfasis suplido.)
Es incuestionable, pues, que esta última regla — también adoptada por el rey mediante la Real Orden de 10 de mayo de 1886 — estableció una norma administrativa que reafirmaba y aclaraba con certeza jurídica el esquema privatiza *554 dor de esta legislación decimonónica, en cuanto a los terrenos ganados al mar y su aplicación expresa a Puerto Rico.([28])
En vista de lo anterior, y a pesar de que los terrenos sumergidos bajo los puertos y las aguas navegables no se mencionan en las leyes españolas, resulta evidente que el estado de derecho vigente tras el cambio de soberanía —el cual surge expresamente de la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción— contemplaba la propiedad particular en los terrenos ganados al mar e incluso, en la zona marítimo-terrestre en determinadas circunstancias. ([29])
*555 Es por ello que, mediante esa legislación decimonónica, para que los terrenos ganados al mar puedan considerarse de dominio público, tendrían que formar parte de la zona marítimo-terrestre, aún después del acto de desecación o relleno. Es decir, estos terrenos tendrían que ser bañados por “el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde no lo sean”. Art. 1 de la Ley de Puertos de 1886.
Así, pues, al examinar el derecho puertorriqueño aplicable al caso de autos, debemos ponderar si alguna ley posterior de nuestro ordenamiento alteró o modificó el estado de derecho, para la fecha en que se realizaron las obras de relleno objeto de la controversia.([30]) El Procurador General sostiene que tanto las enmiendas al Código Civil de Puerto Rico de 1902 provenientes de Louisiana como la aprobación de la Ley de Puertos de 1928 cambiaron dramáticamente el estado de derecho relacionado a la clasificación de los terrenos ganados al mar en nuestra jurisdicción. No le asiste la razón.
B. En primer lugar, debemos señalar que el Art. 12 del Código Civil de 1902 establece que sus disposiciones se aplicarán de manera supletoria en las materias que se rijan por leyes especiales. 31 L.P.R.A. sec. 12. Ante la vigencia de la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción, es evidente que el Código Civil no tuvo el efecto de derogar el estado de derecho que emanó de tales leyes especiales en cuanto a los puertos y los terrenos ganados al mar. ([31])
No obstante, en casos sobre el carácter demanial y la desafectación de los bienes relativos a la costa y a la zona ma *556 rítimo-terrestre, este Tribunal ha entendido meritorio acudir al Código Civil de manera supletoria, pues este cuerpo normativo regula sistemáticamente la clasificación dominical de los bienes y las cosas en nuestro ordenamiento jurídico, incluyendo el mar y sus riberas. Rubert Armstrong v. E.L. A., supra, pág. 631; El Pueblo v. Dimas et al., supra, págs. 1072-1073. A su vez, y aunque tenemos presente que la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción configuran el estado de derecho que aplica específicamente a los terrenos ganados al mar, ello no impide que el Estado procure la afectación posterior de tales predios patrimoniales conforme al esquema normativo establecido por el Código Civil para tales propósitos. Veamos.
Nótese que el Art. 254 del Código Civil de 1930, proveniente del Código Civil de Louisiana, dispone que “[l]as cosas comunes son aquéllas cuya propiedad no pertenece a nadie en particular y en las cuales todos los hombres tienen libre su uso, en conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas”. 31 L.P.R.A. see. 1023. De otra parte, el Art. 255 del Código Civil dispone —de manera idéntica al Art. 339(1) del Código Civil español de 1889— que “[s]on bienes de dominio público, los destinados al uso público, como los caminos, canales, ríos, torrentes y otros análogos”. 31 L.RR.A. see. 1024. Sin embargo, se omitió la segunda parte del Art. 339 del Código Civil español de 1889 que disponía que también eran de dominio público los bienes que le pertenecieran privativamente al Estado. Conforme al nuevo ordenamiento establecido por el Código Civil de 1902, estos bienes dejaron de ser considerados como bienes de dominio nacional y público, y sencillamente se reconocieron como bienes patrimoniales del Estado. A su vez, el Art. 256 del Código Civil dis-pone que son bienes de uso público “los caminos estaduales y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos, y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico”. 31 L.P.R.A. see. 1025. Véanse, además: Ortiz Carras *557 quillo v. Municipio de Naguabo, 108 D.P.R. 366, 369 (1979); E.L.A. v. Tribunal Superior, 97 D.P.R. 644, 668-669 (1959).([32])
Es decir, a partir de 1902 se estableció en Puerto Rico un esquema tripartito de clasificación de bienes conforme a su susceptibilidad de dominio y apropiación: comunes, públicos o patrimoniales. Ello aparenta contrastar con el régimen clasificatorio establecido por el estado de derecho español, que sólo reconocía dos clasificaciones dominicales de bienes: los públicos y los privados. Art. 338 del Código Civil español de 1889, supra.
A pesar de ello, el reconocimiento de la naturaleza comunal de los bienes naturales como el aire y el mar no era ajeno al ordenamiento civil español. De hecho, Manresa explica que el Código Civil de España obra correctamente al prescindir de alusión alguna al dominio del mar por ser éste un bien común, universal y humano. Sin embargo, este tratadista critica que no se haya incluido en la enumeración de bienes de dominio público al mar litoral, por entender que éste es un bien susceptible de apropiación sujeto a la soberanía del Estado, como así lo reconoce la Ley de Puertos de 1880. J.M. Manresa, Comentarios al Código Civil Español, 8va ed. rev., Madrid, Ed. Reus, 1976, T. III, pág. 117-118.([33])
*558 Ciertamente, la distinción primordial entre la clasificación de las cosas bajo el estado de derecho español, que reconocía la Ley de Puertos y el Código Civil español, era el carácter relativo y mutable de éstas en y fuera del comercio. Sin embargo, esta distinción se mantuvo intacta, según el esquema tripartito establecido por el Código Civil de 1902, el cual cuenta con dos órdenes de cosas o bienes que trascienden el alcance de la propiedad privada; a saber, las cosas susceptibles de apropiación y las cosas no susceptibles de apropiación. 31 L.P.R.A. see. 1081.
Mientras que los bienes de dominio público no son susceptibles de propiedad privada por virtud de la ley, los bienes comunes enumerados en el Art. 254 del Código Civil, supra, no son susceptibles de apropiación particular por razón de su propia naturaleza. De hecho, el Art. 274 del Código Civil —proveniente del Art. 482 de Louisiana— establece enfáticamente esta distinción, al disponer que:
Entre las cosas que no son susceptibles de apropiación están comprendidas aquellas que no pueden ser propiedad particular por razón de su objeto, tales como las cosas en común o sean aquéllas cuyo uso y disfrute pertenece a todos los hombres.
Hay otras cosas, por el contrario, que aunque por su naturaleza son susceptibles de propiedad particular, pierden esta cualidad como consecuencia de la aplicación que de ellas se hace para fines públicos incompatibles con la propi — edad privada, si bien pueden adquirir su primitiva condición tan pronto cese el fin público que se les hubiera dado; tales son los terrenos de la carreteras, calles y plazas públicas. 31 L.P.R.A. sec. 1082.([34])
Claramente, el esquema tripartito descrito no impide *559 que los terrenos ganados al mar sean susceptibles de apropiación patrimonial. Ello, dado que la naturaleza de estos bienes tras ser rellenados o desecados posibilita su apropiación física por un particular, independientemente de que la ley no permita dicha apropiación.([35]) De hecho, en vista de esta realidad conceptual es que tanto la Ley de Aguas española como la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción permitían la mutación dominical de los terrenos previamente sumergidos tras ser ganados al mar mediante accesión o relleno, pues reconocían la posibilidad de ostentar propiedad particular sobre tales predios descubiertos mediante la autorización competente de las agencias facultadas para ello.
En conformidad con este análisis, Godreau y Giusti comentan lo siguiente, al discutir los bienes comunes y su entrelazamiento con las disposiciones de las leyes especiales aplicables:
Respecto al mar y sus riberas, aunque son bienes de dominio público, también están sujetos a determinados regímenes especiales. Así, en lo que respecta a la titularidad de las playas, hay que referirse a la antigua Ley de Aguas española de 1866, modificada en 1879, según la cual éstas eran susceptibles de apropiación por los particulares y quienes únicamente tenían que tolerar servidumbres de pesca y de salvamento a lo largo de una estrecha franja. Igual concepción permeába la Ley de Puertos de 1880, que empezó a regir en Puerto Rico a partir del 1886. *560 (Énfasis suplido.) M. Godreau y J.A. Giusti, Las concesiones de la Corona y propiedad de la tierra en Puerto Rico, siglos XVI-XX: Un estudio jurídico, 62 Rev. Jur. U.P.R. 351, 560 (1993).
Es decir, indudablemente el uso del mar es común de todos los seres humanos y que, por su naturaleza, no es susceptible de apropiación patrimonial. Como explica Manresa, “[e]l mar, en efecto, tiene la condición de aquellas cosas que, según las leyes naturales, no pueden ser objeto de un dominio exclusivo”. Manresa, op. cit., pág. 115.([36]) Por otro lado, el litoral, o el mar cercano a las costas, está sujeto al régimen especial que estableció la Ley de Puertos de 1886 y la normativa hídrica especial mencionada. Ello es así, pues las playas no son un ente estático en términos científicos ni jurídicos. Con el pasar del tiempo y por los fenómenos geológicos y ambientales, la marea fluctúa y altera el espacio comprendido por la zona marítimo-terrestre, según se define en la Ley de Puertos de 1886. Precisamente de esta premisa se desprende la política pública instituida por la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción en cuanto a la susceptibilidad patrimonial de los terrenos ganados al mar.
Ya sea por causa de las accesiones o los aterramientos ocasionados naturalmente por el mar, o por las obras de relleno o desecación para ganar terreno autorizadas por el Estado, las leyes especiales antes mencionadas presentaban y regulaban expresamente la nueva naturaleza física que permitía la susceptibilidad patrimonial en determinadas circunstancias de los terrenos ahora descubiertos. Véase J. Escriche, Diccionario razonado de legislación y jurispruden *561 cia, París, Ed. Garnier Hnos., 1853, pág. 1249. Como señala Femando Garrido Falla, no hay duda de que una pequeña parcela de terreno, aunque se encuentre enclavada en la zona marítimo-terrestre, puede ser poseída y rendir utilidad a un particular. Esta realidad física basta para probar que su naturaleza es susceptible de apropiación particular. Véase F. Garrido Falla en M. Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. Edersa, 1980, T. V, Vol. 1, pág. 62.([37])
Al no poderse clasificar los terrenos ganados al mar como bienes comunes, se justificaba normativamente el esquema privatizador para tales predios que estableció la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción. Por lo tanto, es forzoso concluir que dicho régimen especial —el cual mantuvo su vigencia incluso después de la aprobación del Código Civil— impide expresamente tal clasificación demanial.
Además, los terrenos ganados al mar tampoco se pueden considerar, sólo por esa condición previa de terrenos sumergidos, como bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres, según éstos se definen por los Arts. 255-256 del Código Civil de 1930. 31 L.P.R.A. sees. 1024-1025; Rubert Armstrong v. E.L.A., supra. Ello es más evidente aún, pues el régimen especial aplicable que se *562 desprende la Ley de Muelles y Puertos de 1886 y el Art. 22 de su respectiva instrucción, proveía para que los terrenos ganados al mar fueran propiedad particular de quienes hubiesen realizado la obra de relleno con autorización competente. Por consiguiente, los terrenos ganados al mar no pueden ser considerados automáticamente como bienes de dominio público, conforme al estado de derecho mencionado, si tales predios no satisfacen la definición jurídica del concepto zona marítimo-terrestre que estableció y delimitó la referida legislación hídrica del siglo XIX.
C. Por otro lado, debemos examinar si las disposiciones de la Ley de Muelles y Puertos de 1928 (Ley Nú Rico relativas a los terrenos ganados al mar son incompatibles con los preceptos instituidos sobre estos por la Ley de Puertos de 1886.([38]) En lo pertinente a los terrenos ganados al mar, la Sec. 47(b) de la Ley de Ley de Muelles y Puertos de 1928 estableció las facultades de los “capitanes de muelles”, al disponer que estos funcionarios tendrían la función y responsabilidad de:
[v]igilar por sí y con su [sic] auxiliares, por la conservación de los muelles, malecones, terraplenes y porque tanto éstos como los terrenos públicos que forman la zona marítima y los terrenos agregados a ella o ganados al mar, sean conservados y no sean ocupados sin el consentimiento del Comisionado del Interior .... (Enfasis suplido.) 1928 Leyes de Puerto Rico 463.
De dicho articulado no se colige una nueva definición de la zona marítimo-terrestre ni una modificación a la susceptibilidad patrimonial o la naturaleza dominical de los terrenos ganados al mar, según contemplaban la Ley de Puertos de 1886 y el Art. 22 de su respectiva instrucción. Esta ley sólo establecía un sistema administrativo para el manejo de los muelles y los puertos, por lo que dicha dis *563 posición se refiere exclusivamente a ciertos deberes y facultades de un funcionario público.([39])
Ahora bien, con posterioridad a los actos de relleno bajo nuestro escrutinio, en 1968 la Asamblea Legislativa aprobó una ley que por primera vez mencionaba expresamente los terrenos ganados al mar como parte del concepto jurídico de la zona marítimo-terrestre. La Ley Núm. 151 de 28 de junio de 1968, conocida como la Ley de Muelles y Puertos de Puerto Rico de 1968, establecía las funciones y los deberes de la Autoridad de los Puertos y del Secretario de Obras Públicas sobre la zona marítimo-terrestre. 23 L.P.R.A. sees. 2101 et seq.
En lo pertinente al caso de autos, el Art. 1.03(n) de la referida ley definió y delimitó la zona marítimo-terrestre como el espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, donde son sensibles las mareas, y las mayores olas en los temporales cuando las mareas no son sensibles, incluyendo los terrenos ganados al mar y las márgenes de los ríos “hasta el sitio en que sean navegables o se hagan sensibles las mareas”. 23 L.P.R.A. sec. 2103(n). Véase, además, Mun. de San Juan v. J.C.A., 152 D.P.R. 673 (2000). No obstante, dicha ley no tiene ningún efecto sobre el caso de autos, pues expresamente dispone en su Sec. 1.11 que “[n]o afectará derechos adquiridos u obligaciones incurridas por la Autoridad o persona alguna bajo la legislación anterior”. (Énfasis suplido.) 23 L.P.R.A. sec. 2111.([40])
Así las cosas, y por todo lo antes expuesto, no cabe duda de que el estado de derecho en Puerto Rico sobre los terre *564 nos ganados al mar para la fecha cuando se realizaron las obras de relleno en ambas parcelas se desprendía exclusivamente de la Ley de Puertos de 1880 y el Art. 22 de la instrucción promulgada según el Art. 2 del Real Decreto de 5 de febrero de 1886, la cual se aprobó y se extendió a Puerto Rico mediante la Real Orden de 10 de mayo de 1886. Por consiguiente, resulta forzoso resolver la controversia de autos en cuanto al Condado Bay Parcel, según dichos estatutos y la doctrina civilista aplicable.
V
La doctrina civilista examinada nos lleva a concluir que, como consecuencia de su naturaleza susceptible de mutación dominical y apropiación particular tras ser ganados al mar, los terrenos sumergidos bajo aguas navegables son bienes de dominio y uso público por el ordenamiento jurídico instituido por la Ley de Puertos de 1886 y el Código Civil de Puerto Rico. 31 L.P.R.A see. 1024. No obstante, tal como explicamos, los terrenos ganados al mar no se pueden considerar, por esa sola condición de provenir del mar litoral, como bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de las personas. Aclarado, nos corresponde determinar si, en el caso de autos, los terrenos sumergidos que posteriormente se ganaron al mar fueron debidamente desafectados conforme al estado de derecho vigente para la fecha cuando se realizaron los rellenos en el Condado Bay Parcel.
A. En el estado de derecho puertorriqueño aún impera una bifurcación entre los bienes de dominio público y los bienes patrimoniales que permite la mutación dominical de las cosas mediante actos de afectación y desafectación. 31 L.P.R.A. 1082. En nuestro ordenamiento civilista, la afectación implica que una cosa queda destinada a un fin de interés público y adquiere la clasificación jurídica particular de bien de dominio público. Figueroa v. *565 Municipio de San Juan, supra. Véase, además, M. Ballbé, Concepto del dominio público, Barcelona, Ed. Bosch, 1945.
El acto de afectación se deduce de una declaración del legislador (Código Civil, Ley de Puertos, etc.) o mediante los actos administrativos realizados por el Estado bajo la autorización de alguna ley (como por ejemplo, la construcción de una plaza o de un cementerio). En vista de ello, la clasificación demanial puede responder exclusivamente a la propia naturaleza de la cosa, sin que se requiera ningún acto ulterior del soberano, como sería el caso de los ríos y los torrentes, pues su afectación está definida de modo general en la ley con relación a determinadas circunstancias físicas o naturales. 31 L.P.R.A. see. 1024. En otros casos, la afectación responde al acto singular del soberano para construir o establecer un inmueble para fines públicos, como por ejemplo, las carreteras estatales o cementerios municipales.([41])
Según el profesor Godreau, el uso público es el factor definitorio en la clasificación de estos bienes, pues
[e]l carácter de dominio público de un bien no depende de su naturaleza física o geológica. Lo determinante es su finalidad: el uso público del mismo. De ahí que un bien, originalmente de dominio público, pueda transformarse en bien patrimonial, susceptible de enajenación, si su uso cesa de ser público. (Enfasis suplido.) Godreau y Giusti, supra, pág. 563.
Por consiguiente, la desafectación es el acto contrario a la afectación, que produce el efecto de la pérdida de la clasificación de dominio público del bien objeto de dicho acto. Como mencionamos anteriormente, la desafectación presentada por el Art. 274 del Código Civil de Puerto Rico requiere que para adquirir una condición patrimonial, el bien de dominio público susceptible por su naturaleza de propiedad particular cese el fin público que se le hubiera *566 dado. 31 L.P.R.A. see. 1082. Véase, además, Balzac v. Registrador, supra.
La doctrina civilista española sobre los bienes de dominio público establece que la desafectación procede del mismo modo en que tuvo lugar la afectación. Es decir, la mutación dominical ocurre por virtud de la ley, por actos administrativos o por cambios en las condiciones naturales de los bienes que los excluyen de lo previsto en la ley.([42]) Álvarez Gendin, op. cit., pág. 41. De otra parte, Manresa indica que “la función del Estado, como supremo ordenador jurídico de la sociedad, entraña la facultad de distinguir las cosas públicas y de determinar, en virtud de su soberanía, el destino propio de los medios”. Manresa, op. cit., pág. 128.
Según la doctrina española, el acto de desafectación puede ser realizado tanto por una autoridad legislativa como por una entidad administrativa, siempre y cuando se tenga competencia para ello. Más aún, se entiende que el destino de las cosas no depende tanto de urna declaración expresa ejecutiva o administrativa, sino del uso público que se le concede. Cuando el uso público cesa respecto a determinados bienes, cesa también su clasificación de dominio público. Manresa, op. cit., pág. 129; García de Enterría, op. cit. La desafectación, sea expresa o tácita, generalmente implica que los bienes pasan al patrimonio particular del Estado para regirse por leyes especiales administrativas, como lo sería la Ley de Puertos y la Ley de Aguas. Asimismo, la transformación patrimonial de tales bienes implica que éstos pierden su carácter de inalienabilidad, imprescriptibilidad e inembargabilidad. Figueroa v. Municipio de San Juan, supra.
De otra parte, es menester señalar que la desafectación de los bienes que son de dominio público “por su naturaleza” requiere que éstos pierdan la condición que justi *567 fica su inclusión en el dominio público. Garrido Falla explica que para que ocurra esta mutación dominical tienen que mediar unas modificaciones topográficas artificialmente introducidas por un particular (como lo sería la alteración de un cauce de un río que deja al descubierto el antiguo álveo o el relleno y desecación de una marisma), o unas alteraciones naturales de sus condiciones físicas (como lo sería, por ejemplo, la retirada del mar, que supondría simultáneamente la retirada de la zona marítimo-terrestre). Según el mencionado tratadista, en estos casos no hay duda de que se puede producir una desafectación, siempre y cuando se cumpla con el esquema administrativo presentado por el régimen especial aplicable.([43]) En el caso de los terrenos ganados al mar, dicho esquema proviene de la Ley de Puertos de 1886 y el Art. 22 de su respectiva Instrucción. Véase Garrido Falla, op. cit, págs. 84^85.
B. Se desprende de dicha doctrina que la desafectación según el Art. 274 del Código Civil de Puerto Rico puede ocurrir por un acto de soberanía, ya sea mediante la aprobación de una ley a tales efectos o mediante un acto administrativo con los poderes delegados para ello, o según los cambios en la condición natural de los bienes que los excluyan de la clasificación contemplada por la propia ley. El factor fundamental para la desafectación debe ser que haya cesado el fin público que se le hubiera dado al bien objeto de desafectación. 31 L.P.R.A. see. 1082.
De hecho, nuestro ordenamiento puede requerir una combinación de las modalidades de desafectación para que *568 ésta proceda conforme a derecho. En lo referente a los terrenos sumergidos, los cuales consideramos bienes de dominio público “por su naturaleza” por mandato del Código Civil, hemos observado que el estado de derecho vigente para la fecha cuando se realizaron los rellenos en el Condado Bay Parcel —que se deduce exclusivamente de la Ley de Puertos de 1886 y del Art. 22 de su respectiva instrucción— contemplaba su posible desafectación al transformarse en terrenos ganados al mar. Para que procediera la desafectación, no tan sólo se requería la degradación de la naturaleza de los terrenos sumergidos mediante actos de accesión u obras de desecación y relleno, sino que se requería el cumplimiento con un esquema administrativo establecido por la referida legislación hídrica española.
Esta conclusión se desprende de la doctrina civilista antes mencionada, integrada con la normativa que estableció tanto la Ley de Aguas española de 1866 como la Ley de Puertos de 1886 y el Art. 22 de su Instrucción. Estas legislaciones hídricas formularon el estado de derecho aplicable al caso de autos, el cual claramente planteaba la posibilidad de que los terrenos ganados al mar litoral mediante obras construidas por el Estado, los municipios o los particulares competentemente autorizados para ello, fueran propiedad de la entidad que los hubiese llevado a cabo.([44])
Es decir, la desafectación de los terrenos sumergidos en aguas navegables no tan sólo requiere un acto de alteración a su naturaleza que justifique la nueva clasificación patrimonial, sino que requiere un acto administrativo que autorice y convalide tales obras de degradación *569 artificial. Para ello, varias disposiciones de la Ley de Puertos de 1886 y su respectiva instrucción establecían un esquema administrativo con relación a la concesión de permisos y las autorizaciones para la construcción de obras permanentes en las costas, los puertos, las marismas y otros terrenos enclavados en la zona marítimo-terrestre a título particular. Guaita, op. cit, págs. 30-31.
La Ley de Muelles y Puertos de 1928 sólo alteró este esquema en el sentido de sustituir al Ministerio de Ultra-mar y de la Marina por el Comisionado de Interior del gobierno insular de Puerto Rico.([45]) Sin embargo, y contrario a lo que aduce el Procurador General, ([46]) no hemos encontrado ninguna fuente jurídica en el estado de derecho puertorriqueño que exija una declaración expresa de la Asamblea Legislativa para que proceda la desafectación de los terrenos ganados al mar, cuando éstos dejan de ser un bien de dominio público “por su propia naturaleza” tras la autorización administrativa de la entidad pública con jurisdicción para ello.([47])
*570 En conformidad con el estado de derecho antes examinado, es evidente que el Condado Bay Parcel constituye un terreno ganado al mar que fue debidamente desafectado en su totalidad, por lo que no puede ser clasificado como un bien de dominio público. Las obras de relleno realizadas en la década de los cincuenta que crearon dicha parcela —con el propósito de ampliar las instalaciones del hotel Caribe Hilton— fueron dirigidas por el propio Estado Libre Asociado por conducto de la Compañía de Fomento Industrial.
Estas obras recibieron la autorización correspondiente de la Junta de Planificación y del Departamento de Obras Públicas, organismos administrativos con jurisdicción para la fecha cuando se realizaron los rellenos en la referida parcela.([48]) Se colige de la normativa civilista examinada que, en el caso del Condado Bay Parcel, dicha autorización administrativa fue un acto jurídico adecuado y suficiente —según la Ley de Puertos de 1886 y el Art. 22 de su respectiva Instrucción— para desafectar los mencionados terrenos. Por lo tanto, tales predios patrimoniales se integraron al comercio de las personas conforme al estado de derecho aplicable, por lo que pueden ser objeto de apropiación particular.
VI
Por otro lado, y con relación al Coast Guard Parcel, es menester aclarar que no ocurrió una afectación tácita de *571 dicha parcela tras su adquisición por la Administración de Terrenos en 1991. No cabe duda de que al extinguirse el interés federal sobre tales predios, éstos han estado sujetos de manera prospectiva al derecho estatal. State Land, Board v. Corvallis Sand & Gravel Co., 429 U.S. 363 (1977). Sin embargo, ello no implica que el derecho estatal se pueda aplicar retroactivamente en perjuicio de derechos adquiridos al amparo de un estado de derecho distinto al que imperaba cuando se llevaron a cabo las obras de relleno en controversia.
Aunque el Art. 1.03 de la Ley de Muelles y Puertos de 1968, supra, se podría interpretar para incluir los terrenos ganados al mar en la definición de zona marítimo-terrestre, dicha definición no podría aplicarse de forma alguna a los rellenos del Coast Guard Parcel que se llevaron a cabo en 1941. Como mencionamos anteriormente, la misma Ley de Puertos de 1968 establece claramente que sus preceptos "no afectará [n] derechos adquiridos u obligaciones incurridas por la Autoridad o persona alguna bajo la legislación anterior. Pero esta ley será aplicable a todas las acciones y procedimientos que surjan después de su vigencia”. 23 L.P.R.A. see. 2111.
A la luz de lo anterior, es inevitable concluir que el Derecho puertorriqueño aplicable al Coast Guard Parcel a partir de 1991 es el estado de derecho que emana de la Ley de Puertos de 1886 y el Art. 22 de su respectiva Instrucción, según lo examinamos en las partes IV y V de esta opinión. Ello, dado que las obras de relleno en controversia se realizaron a título patrimonial por el Departamento de la Marina en 1941, casi tres décadas antes de que entrara en vigor la Ley de Puertos de 1968.
Creemos que, aunque el Gobierno de Puerto Rico tenía la potestad para afectar nuevamente tales predios, cuando los adquirió mediante un contrato de compraventa para destinarlos al uso y dominio público, en conformidad con el estado de derecho puertorriqueño, el expediente del *572 caso de autos demuestra que tal conversión dominical nunca ocurrió. Para determinar si el carácter de un bien es de dominio público, lo más importante es considerar la finalidad y el destino que se le otorgue a éste, y no a su naturaleza física o geológica. 31 L.P.R.A. see. 1082. Véase Godreau y Giusti, supra, pág. 563.
El Gobierno de Puerto Rico nunca destinó ni administró los terrenos ganados al mar del Coast Guard Parcel como bienes de dominio público. Ni las expresiones de un fimeionario de la Administración de Terrenos ni un Reglamento de Zonificación Especial, que nunca fue implantado y que fue derogado por uno que reconoce la patrimonialidad de los terrenos al año siguiente de la adquisición de éstos, constituyen actos suficientes para la debida configuración de la afectación demanial de los terrenos. Por consiguiente, concluimos que tales predios continuaron siendo bienes patrimoniales tras su adquisición por el Estado Libre Asociado de Puerto Rico en 1991.
De otra parte, es menester señalar que el Departamento de Recursos Naturales y Ambientales certificó en diciembre de 1994 un deslinde de la zona marítimo-terrestre de los terrenos rellenados del Coast Guard Parcel, que según se desprende del expediente, no interfería con los predios proyectados para la construcción del proyecto Paseo Caribe. Véase el Exhibit Estipulado Núm. 34, Ap. Vol. I. Asimismo, en septiembre de 1998, dicha agencia aprobó el deslinde de la zona marítimo-terrestre del Hotel Caribe Hilton —incluso, claro está, el Condado Bay Parcel— el cual también certificó que dicha parcela no se encontraba enclavada en la zona marítimo-terrestre del litoral colindante. Véase el Exhibit Estipulado Núm. 35, Ap. Vol. I.
Aunque dichos terrenos ganados al mar están enclavados en lo que anteriormente formaba parte de la zona marítimoterrestre, no se ha presentado prueba alguna que los terrenos objeto de controversia se encuentren, luego de realizados los rellenos, en el espacio de las costas que baña el mar en su flujo y reflujo, ni en donde son sensibles las mareas; tampoco en el espacio al cual llegan las mayores olas en los *573 temporales en donde las mareas no son sensibles. Por lo tanto, es forzoso concluir que conforme al derecho aplicable, los terrenos ganados al mar en el Condado Bay Parcel y el Coast Guard Parcel fueron debidamente desafectados y convertidos en bienes patrimoniales, por lo que son susceptibles de apropiación particular.
VII
Para concluir, la polémica relacionada al proyecto Paseo Caribe ha generado un intenso debate en el país sobre la seguridad jurídica y la estabilidad normativa de nuestro ordenamiento constitucional. Este principio universal del Derecho exige el reconocimiento de que las leyes y las reglas en una sociedad democrática emanan de la soberanía del pueblo, expresada por conducto de los Poderes Ejecutivo y Legislativo del Gobierno, y que existe un Poder Judicial independiente para garantizar la certeza y la confianza en la interpretación imparcial del estado de derecho aplicable. Ello se mantuvo presente al pasar juicio sobre la clasificación jurídica de los terrenos ganados al mar objeto de controversia, pues su resolución trasciende las particularidades del caso de autos al incidir sobre una política de planificación urbana que cimentó los orígenes de muchas comunidades del país.
Por lo tanto, es necesario enmarcar esta opinión en el contexto histórico apropiado. Debemos recalcar que una tercera parte del litoral de la bahía de San Juan ha sido modificada por rellenos o dragados. Las áreas rellenadas —en su mayoría mediante obras gubernamentales realizadas alrededor de los años cuarenta con finalidades urbanas— comprenden las zonas de: Puerto Nuevo, Martín Peña, la Puntilla, Puerta de Tierra, Isla Grande, Sabana y Amelia, Isla de Cabras, Puente Blanco, Juana Matos, Barrio Obrero, Ocean Park, Isla Verde, el Condado, la península Esperanza y, por último, las porciones sudeste y noreste de la isleta de San Juan. Véase J. Seguinot Barbosa, San Juan, Puerto Rico —La ciudad al margen de la bahía: una visión geoecológicay jurídica, San Juan, Ed. GEO, 1997, pág. 90. Véanse, *574 además: A. Sepúlveda y J. Carbonell, Cangrejos— Santurce; Historia ilustrada de su desarrollo urbano (1519-1950), San Juan, Ed. Carimar, 1987; A. Sepúlveda, San Juan; Historia ilustrada de su desarrollo urbano, 1508-1898, San Juan, Ed. Carimar, 1989.
De esta forma, la política de dragado y relleno, dirigida por el propio Estado durante gran parte del siglo XX, dio origen a muchas comunidades de la ciudad capital, las cuales abarcan una diversidad socioeconómica y cultural representativa de la sociedad puertorriqueña. Surge de nuestro ordenamiento que en la mayoría de los sectores mencionados —como por ejemplo, los barrios de Sabana y Amelia asentados sobre las áreas de manglares al sur de la bahía— no ha mediado acto legislativo alguno para aclarar la naturaleza privativa de los terrenos rellenos. Véase J. Seguinot Barbosa, op. cit, pág. 74.([49]) A pesar de la falta de acción legislativa para aclarar la naturaleza patrimonial de estos sectores rescatados del mar o de terrenos sumergidos en áreas de manglares, lo cierto es que el Estado promovió y participó activamente en este proceso de rellenos para fines urbanísticos.([50])
*575 En el caso de autos, y desde el contexto histórico antes mencionado, es evidente que las obras de relleno del Coast Guard Parcel y del Condado Bay Parcel realizadas a media-dos del siglo XX no fueron producto de una anomalía o de un procedimiento administrativo irregular. Todo lo contrario, el origen de los terrenos ganados al mar, objeto de controversia, forma parte de un proyecto que se ajustaba enteramente al enfoque urbanístico de la época, con la autorización expresa de las entidades gubernamentales que se entendían con jurisdicción para otorgar los permisos correspondientes. Avalar la novel teoría esgrimida por el Estado en este caso, colocaría en una precaria situación a miles de hogares localizados en algunas de las zonas más características de la zona metropolitana. No podemos actuar en abstracción de esa realidad.
Por todo lo antes expuesto, concluimos que los terrenos ganados al mar en el Coast Guard Parcel y en el Condado Bay Parcel fueron debidamente desafectados conforme al estado de derecho aplicable. Estos terrenos son susceptibles de enajenación patrimonial, por lo que no son bienes de dominio público. Por consiguiente, se declara “no ha lugar” la apelación y se confirma la sentencia declaratoria dictada por el Tribunal de Primera Instancia. Se declara que SGCP es el titular de los terrenos bajo nuestro escrutinio y que First Bank es su acreedor hipotecario conforme a los asientos pertinentes del Registro de la Propiedad.

Por otro lado, y en vista de que hemos resuelto la controversia con respecto a la titularidad de los terrenos ganados al mar, nada impide que SGCP, Hilton International y el Estado Libre Asociado de Puerto Rico procedan a otorgar una escritura, constituyendo una servidumbre de paso que 
*576
establezca los accesos públicos necesarios al Fortín San Jerónimo del Boquerón, tanto para su reparación y mantenimiento como para el uso y disfrute del público en general. Sin duda alguna, el Fortín San Jerónimo del Boquerón es un bien de dominio público que le pertenece al Pueblo de Puerto Rico, por lo que dicha servidumbre debe constituirse libre de restricciones y a perpetuidad.

Se dictará la sentencia correspondiente.

La Jueza Asociada Señora Fiol Matta emitió una opinión disidente y concurrente.

(1) Esta opinión contrasta con una anterior del Secretario de Justicia que sostenía que los terrenos ganados al mar en los predios en que ubica el proyecto Paseo Caribe eran bienes patrimoniales. Op. Sec. Just. Núm. Í9 (2002). Asimismo, se revocó una opinión anterior del Secretario de Justicia que concluía que la playa del Hotel Caribe Hilton era de naturaleza privada. Op. Sec. Just, de 25 de noviembre de 1970 (no publicada).

(2) En la alternativa, los demandantes solicitaron que se declarara que los terrenos, cuya titularidad fue controvertida por la opinión del Secretario de Justicia, fueron usucapidos, por lo que el título obtenido por San Gerónimo Caribe Project, Inc. (SGCP) es válido. Asimismo, adujeron que el Estado Libre Asociado está impedido —bajo la doctrina de cosa juzgada por transacción extrajudicial— de alegar ahora que cualquier porción del Coast Guard Parcel nunca dejó de ser de dominio público. En última instancia, alegaron que SGCP y First Bank Puerto Rico, Inc. (First Bank) son terceros regístrales a quienes no se les puede despojar de sus títulos regístrales o acreencias hipotecarias sobre estos terrenos por las doctrinas de accesión a la inversa, los actos propios y derechos adquiridos. No obstante, en esta opinión no atendemos tales señalamientos, pues la resolución de la controversia de umbral hace innecesaria su discusión.

(3) A pesar de que existen múltiples referencias a este monumento histórico como el “Fortín San Gerónimo”, nótese que su nombre oficial en español es el “Fortín San Jerónimo del Boquerón”.

(4) En el pasado, este Tribunal ha tomado conocimiento judicial de que, en su origen, la totalidad territorial de la isla de Puerto Rico pertenecía a la Corona Española por razón del descubrimiento, la conquista y la colonización. En algunas instancias, el dominio de los terrenos de la isla fue pasando gradualmente a la propiedad particular de los ciudadanos por concesiones onerosas o gratuitas realizadas por el gobierno central. Rubert Armstrong v. E.L.A., 97 D.P.R. 588, 615 (1969); Pueblo v. Rojas, 53 D.P.R. 121, 131 (1938). En lo que respecta al proyecto Paseo Caribe, es preciso señalar que radica en unos terrenos que forman parte del litoral nororiental de la entrada peninsular a la isleta de San Juan, que nunca fueron enajenados ni concedidos a ningún ciudadano particular, pues se destinaron durante cuatro siglos a la defensa de los mares y del poblado colonial.

(5) Además, la Ley Foraker dispuso que las leyes y ordenanzas vigentes en Puerto Rico al momento de aprobarse dicho estatuto continuarían en vigor, en tanto en cuanto fuesen compatibles con las leyes de Estados Unidos o con las disposiciones de la propia Ley Foraker, y mientras no fuesen enmendadas o derogadas mediante una ley del Congreso o de la autoridad legislativa de Puerto Rico. See. 8 de la Ley Foraker, Documentos Históricos, L.P.R.A., Tomo 1; Muñoz Díaz v. Corte, 42 D.P.R. 384, 390 (1931).

(6) Esta cesión se hacía a condición expresa de que el Gobierno de Puerto Rico renunciara a cualquier interés o reclamación en los terrenos y edificios reservados por el Presidente, según las disposiciones de dicha ley. íd. Mediante legislación, el gobierno insular cumplió efectivamente con esta condición el 16 de febrero de 1903.

(7) En lo referente al caso, la Reserva Militar Principal se delimitaba de la manera siguiente:
“1000 feet more or less to the San Antonio Channel; thence following said channel easterly to the San Antonio Bridge; thence northerly along the shore line of the Laguna TO THE SEA IN FRONT OF SAN GERONIMO; thence northerly and westerly ALONG THE SEA PASSING SAN GERÓNIMO, Escambrón, and San Cristobal to a point in line with the westerly line of the San Sebastian Bastion (Énfasis suplido.) Orden General de 1903, supra.
Según el estilo de redacción utilizado por el Congreso al aprobar la Ley de 1902, las partes sostienen dos puntos de vista divergentes en cuanto a si la referida ley prohibía al Presidente reservar los terrenos sumergidos para propósitos federales. Asimismo, las partes difieren en cuanto a si la orden de 1903 incluyó lo que en la actualidad se conoce como la zona marítimo-terrestre e, incluso, los terrenos sumergidos que fueron rellenados por el Estado a mediados del siglo pasado y cuya naturaleza dominical es objeto de controversia. No obstante, y a pesar de que gran parte de la discusión de las partes gira en torno al alcance de la Ley de 1902 y de la Orden Ejecutiva de 1903, consideramos que no es necesario abordar ese asunto para disponer del caso. Lo cierto es que independientemente de que si los terrenos sumergidos, objeto de la controversia hubieren sido propiedad del gobierno federal o del Gobierno de Puerto Rico, basta con determinar si el Gobierno de Estados Unidos era el propietario de los terrenos aledaños a la costa para resolver el asunto jurisdiccional del derecho aplicable. California ex rel. State Lands Comm’n v. U.S., 457 U.S. 273 (1982).

(8) Han surgido dudas sobre si lo que la Ley Jones transfirió al gobierno insular fue el dominio sobre estos bienes o el control y su administración en beneficio del Pueblo de Puerto Rico. No obstante, el Congreso despejó toda duda y aclaró el asunto cuando aprobó en 1980 una enmienda a la See. 8 de la Ley de Relaciones Federales, equivalente a la See. 8 de la Ley Jones, supra, para definir el “control” al que se refiere dicha disposición como todo derecho, título e interés sobre los terrenos sumergidos bajo aguas navegables a favor del Gobierno de Puerto Rico. Ley Púb. Núm. 96-202 de 12 de marzo de 1980, 94 Stat. 91 (48 U.S.C.A. see. 749). Mediante la referida enmienda, el Congreso confirmó la jurisdicción y el dominio de Puerto Rico sobre los terrenos sumergidos alrededor de sus costas en virtud de la Ley Jones.

(9) Nótese que el “arrendamiento” a favor del señor Baker ha sido valorado para efectos prácticos por los tribunales puertorriqueños y federales como un negocio jurídico a título de dominio. Estados Unidos retuvo el título en el contrato original de arrendamiento, no para privar al señor Baker y a sus cesionarios de cualquiera de los beneficios resultantes del título de dominio, sino únicamente para proteger su derecho reservado de libre uso en cualquier emergencia de seguridad nacional. United States v. San Gerónimo Development Co., 154 F.2d 78 (1er Cir. 1946); De la Haba v. Tribl. Contribuciones, 76 D.P.R. 923 (1954), confirmada en San Gerónimo Development Co. v. Treasurer of Puerto Rico, 233 F.2d 126 (1er Cir. 1956).

(10) Se desprende del expediente que este contrato de arrendamiento fue impugnado por el Gobierno de Estados Unidos ante el Tribunal Federal en 1925. El Tribunal de Apelaciones de Estados Unidos para el Primer Circuito sostuvo la validez del contrato, mas no dirimió el asunto de la titularidad de los terrenos sumergidos, pese a una solicitud a esos efectos del Gobierno de Puerto Rico, quien participó en el pleito en calidad de interventor. El Gobierno de Puerto Rico intentó impugnar el arrendamiento precisamente por incluir terrenos sumergidos, pero nunca aceptó el quitclaim deed ofrecido por el señor Baker. De hecho, el tribunal apelativo federal expresó: “in any event, the proofs do not show that Commander Baker has defrauded the government in the matter of the submerged area.” Baker v. United States, 27 F. 2d 863, 877 (ler Cir. 1928).

(11) De hecho, dicha proclama hace mención expresa de los terrenos sumergidos, al declarar que las tierras de la Reserva Naval San Jerónimo se cederían al gobierno insular:
“...together with all the right, title and interest of the United States in all shore and submerged lands lying shoreward of a line drawn through points Nos. 90, 91, 92 and 93, as shown on the military chart of the Military Reservation of San Juan, Puerto Rico.” (Énfasis suplido.) Proclama Presidencial Núm. 1889 de 26 de agosto de 1929.

(12) Las partes y la sentencia apelada discuten la aplicación de la Ley Pública Núm. 703 de 2 de julio de 1940 aprobada por el Congreso y llegan a conclusiones divergentes en cuanto a si el mero relleno de los terrenos sumergidos aledaños al Coast Guard. Parcel constituyó un ejercicio de expropiación forzosa al amparo de la referida ley. De igual forma, discuten la aplicabilidad de la Ley Núm. 66 de 25 de abril de 1940 de la Asamblea Legislativa de Puerto Rico para ponderar la posibilidad de que los terrenos sumergidos fueron transferidos al Gobierno de Estados Unidos en virtud de la legislación. No obstante, somos del criterio que esta discusión es innecesaria para la solución adecuada del caso de autos.

(13) Nótese que en junio de 1986, la Junta de Planificación aprobó el Reglamento de Zonificación del Condado, el cual incluía los terrenos rellenados como parte de una zona comercial turística. Asimismo, el Fortín San Jerónimo del Boquerón y una estrecha franja de terrenos que bordeaba la costa —para propósitos del acceso a esta edificación histórica— se zonifiearon como propiedad pública.

(14) Surge del expediente que en 1990, el Estado solicitó información y cursó varias comunicaciones a la Administración de Servicios Generales de Estados Unidos sobre la titularidad de los terrenos del Coast Guard Parcel. No obstante, el Estado decidió no impugnar tal titularidad y decidió negociar la compraventa de dichos terrenos tras ponderar las posibilidades de prevalecer en la esfera judicial contra el gobierno federal. Véase Memorando de la Oficina del Gobernador, Í4 de febrero de 1991.

(15) Más aún, el contrato estipulaba que su aceptación constituía una transacción extrajudicial y una renuncia a cualquier disputa, reclamo, o causas de acción “including, but not limited to quiet title actions, in any way related to the subject property and arising from the beginning of time to the current date”. Exhibit Estipulado Núm. 33, Ap. Vol. I.

(16) La Ley Núm. 49 de 20 de abril de 1949 (1949 Leyes de Puerto Rico 119) autorizó al Comisionado del Interior a negociar el traspaso y la devolución de la nuda propiedad sobre los terrenos donde enclava el Fortín San Jerónimo del Boquerón al gobierno de Estados Unidos, con la condición de que ese país adquiriera la “posesión y dominio absoluto” sobre éstos para dedicarlo a un parque nacional o monumento histórico administrado por el Servicio Nacional de Parques. No obstante, la historia confirma que dicho traspaso nunca se concretó.

(17) De hecho, y por encomienda del gobierno a raíz de su importancia para la industria turística de la isla, el propio Sánchez Vilella supervisó directamente la construcción y el desarrollo del Caribe Hilton como ingeniero residente del proyecto. A. Sepúlveda Rivera, Puerto Rico urbano, atlas histórico de la ciudad puertorriqueña, San Juan, Ed. Carimar, 2004, Vol. 4, pág. 60.

(18) Simultáneamente, dicho funcionario solicitó, junto a la Administración de Terrenos, la rectificación registral del Coast Guard Parcel, dado que aparecía inscrita dos veces a favor de diferentes dueños —el Estado Libre Asociado y la Administración de Terrenos— como consecuencia de varios trámites accidentados ante el Registro de la Propiedad. Véase el Exhibit Estipulado Núm. 39, Ap. Vol. I.

(19) Nótese que el debate público sobre el acceso al Fortín San Jerónimo del Boquerón fue lo que suscitó originalmente la controversia. En el 2007, SGCP y el Instituto de Cultura Puertorriqueña se reunieron y firmaron el “Acuerdo de reconocimiento de un acceso irrestricto y a perpetuidad del Pueblo de Puerto Rico al fortín San Jerónimo del Boquerón”. En dicho contrato, las partes estipularon que se otorgaría una escritura en la que se establecería el rango de derecho que ostenta el Estado Libre Asociado de Puerto Rico en el acceso. No obstante, el Departamento de Justicia se aseguró de no conceder ningún reconocimiento en cuanto a la titularidad de los terrenos en controversia. En vista de ello, hoy no se ha otorgado ningún tipo de escritura, constituyendo servidumbre de paso a favor del Estado Libre Asociado de Puerto Rico. Según la opinión del Secretario de Justicia de diciembre de 2007, la razón por la cual aún no han perfeccionado este convenio es que la constitución de una servidumbre de paso presume la existencia de un predio sirviente cuya titularidad es ajena.

(20) De manera análoga, el Tribunal Supremo federal ha resuelto que “accretions, regardless of cause, accrue to the upland owner”. California ex rel. State Lands Comm’n v. U.S., supra, pág. 285. Apesar de que dicha regla del derecho común federal atiende los casos de acreción gradual y no es expresamente aplicable a los rellenos, ésta es ilustrativa del reconocimiento de que los terrenos previamente sumergidos bajo las aguas navegables del gobierno federal son susceptibles de apropiación particular.

(21) Véanse, además: Adaray Realty Corp. v. Faber, 227 App. Div. 618, 235 N.Y.S. 660 (1929), In re Water Front on Upper New York Bay, 246 N.Y. 1, 157 N.E. 911 (1927). State ex rel. McLeod v. Murrell’s Inlet Camp & M., Inc., 192 S.E.2d 199 (1972); State v. A.J. Industries, Inc., 397 P.2d 280 (Ask. 1964).

(22) De hecho, al momento de realizarse el relleno, el Rivers and Harbors Appropiations Act de 1899 disponía que en ausencia de autorización del Secretario de Guerra, no podría depositarse relleno alguno en bahías, lagunas o cuerpos de agua navegables de Estados Unidos. 33 U.S.C.A. see. 403. Ello demuestra la existencia de un esquema administrativo que disponía tales obras de relleno.

(23) Dicho artículo definía las playas como
"... el espacio que alternativamente cubren y descubren las aguas en el movimiento de la marea. Forma su límite interior o terrestre donde llegan las más altas mareas y equinocciales. Donde no fueren sensibles las mareas, empieza la playa por la parte de tierra en la línea donde llegan las aguas en las tormentas o temporales ordinarios. Art. 1 de la Ley de Aguas española de 1866.”

(24) Por otro lado, el Art. 4 de la referida ley disponía lo siguiente:
“Son del dominio público los terrenos que se unen a las playas por las accesiones y aterramientos que ocasione el mar. Cuando ya no los bañen las aguas del mar, ni sean necesarios para los objetos de utilidad pública, ni para establecimiento de especiales industrias, ni para el servicio de vigilancia, el Gobierno los declarará propiedad de los dueños de las líneas colindantes en aumento de ellas.” (Enfasis suplido.)

(25) Nótese que este artículo de la Ley de Puertos de 1880 se refiere específicamente a las accesiones naturales ocasionadas por el mar, y no a los terrenos ganados al mar por el ser humano mediante obras de relleno.

(26) De hecho, tanto la Ley de Aguas española de 1866 como la Ley de Puertos de 1880 han sido criticadas por la doctrina científica por permitir —en la práctica y en la teoría— la nacionalización patrimonial y la privatización del mar, las riberas y las costas al reconocer la propiedad particular en la zona marítimo-terrestre. Véanse: T. Quintana López, La privatización de los terrenos de que ha sido desalojado el mar, 111 Rev. Adm. Púb. 373, 384 (1986); R. Parada, Derecho administrativo: bienes públicos; derecho urbanístico, 7ma ed., Madrid, Ed. Marcial Pons, 1998, T. III, pág. 164; J.L. Villar Palasi, Apuntes de Derecho Administrativo, Madrid, Facultad de Derecho, 1974, pág. 66. Véase, además, la Exposición de Motivos de la Ley Orgánica de Costas Española de 1988. La doctrina jurisprudencial española también ha reconocido la posibilidad de enclaves privados en la zona marítimo-terrestre al amparo de la mencionada legislación hídrica. Véanse, a modo ilustrativo, las Sentencias del Tribunal Supremo español (S.TS) de 20 de abril de 1959 (RJ 1959 4309), 18 de junio de 1965 (RJ 1965 3338), 19 de junio de 1967 (RJ 1967, 3171), 13 de octubre de 1981 (RJ 1981 3737), 20 de enero de 1993 (RJ 1993, 447).

(27) Por otro lado, el Art. 42 de la Ley de Puertos requería que, cuando las construcciones fueran de carácter permanente, la autorización la tendría que otorgar el Ministro de Ultramar, en consulta con el Ministro de la Marina. Asimismo, el Art. 45 establecía que estos funcionarios tenían la facultad para autorizar la formación de “salinas, fábricas, y otros establecimientos que en todo o en parte ocupen terrenos de dominio público o con destino al servicio particular”. A su vez, el Art. 51 de la referida Ley de Puertos establecía un esquema administrativo para la concesión de permisos para desecar y aprovechar las marismas que fueran propiedad del Estado o de particulares. Más aún, el Art. 55 declaraba que estas concesiones en las marismas se otorgarían sin pública licitación y a perpetuidad. Es decir, dicha ley presentaba la posibilidad de que las entidades gubernamentales con jurisdicción pudieran autorizar y permitir la ejecución de obras nuevas en los bienes antes mencionados, e incluso contemplaba que se rescataran los terrenos sumergidos en las marismas.

(28) El Real Decreto de 5 de febrero de 1886 que hizo extensivo a Puerto Rico la Ley de Puertos de 1880, disponía en su Art. 2 que “[e]l Ministro de Ultramar dictará la Instrucción para ejecución de la ley, y dará cuenta á las Cortes del presente decreto”. Posteriormente, el Ministro de Ultramar promulgó la referida Instrucción, y ésta se aprobó y se extendió a Puerto Rico mediante la Real Orden de 10 de mayo de 1886. Colección Legislativa de España, Madrid, 1887, 2da parte, T. 136, págs. 1116-1117. Publicada en la Gaceta de Madrid, 19 de mayo de 1886, Núm. 139, 1886/03882.
Este instrumento jurídico, la instrucción, comparte en este caso los requisitos que condicionan el ejercicio de la potestad reglamentaria. Así, esta instrucción no se limita a definir la organización interna del órgano administrativo y dirigir su actividad como la de sus funcionarios, sino que regula derechos y deberes de los particulares, así como refleja también normas interpretativas de la legislación de puertos que vincularán, desde luego, a la Administración. Además, se promulga en virtud del Real Decreto de 5 de febrero de 1886 que hizo extensiva la Ley de Puertos a Puerto Rico y que ordenó al Ministerio de Ultramar a dictar la correspondiente instrucción para su ejecución.
Finalmente, una vez promulgada se publicó en la Gaceta de Madrid, por lo cual podemos concluir que encubre verdaderamente un auténtico reglamento. M. Baena del Alcázar, Instrucciones y circulares como fuente de derecho administrativo, 48 Rev. Adm. Púb. 107 et seq. (1965). Cf, M. Moreno Rebato, Circulares, instrucciones y órdenes de servicios: naturaleza y régimen jurídico, 147 Rev. Adm. Púb. 159 et seq. (1998).

(29) A modo ilustrativo, el estado de derecho antes mencionado tuvo vigencia en España hasta finales del siglo XX, pues los Reglamentos de Puertos de 1912 y 1928, la Ley de Puertos de 1928, así como la Ley de Costas de 26 de abril de 1969, no alteraron la susceptibilidad patrimonial de los terrenos ganados al mar o previamente sumergidos. Véase T. Quintana López, op. cit. De hecho, el Art. 2 de la Ley de Puertos española de 1928 concedía un derecho de tanteo a los dueños colindantes de los terrenos ganados por accesiones o aterramientos cuando el Ministerio de Hacienda desafectara y los enajenara. No fue hasta la aprobación de la Ley de Costas y Puertos de 28 de julio de 1988, aprobada al amparo del Art. 132.2 de la Constitución Española de 1978, que cambió la visión en cuanto a los terrenos ganados al mar. Ello, dado que el Art. 132.2 de la Constitución española estableció expresamente que “[s]on bienes de dominio público estatal los que determine la ley y, en todo caso, la zona marítimo-terrestre, las playas, el mar territorial y los recursos naturales de la zona económica y la plataforma continental” (Enfasis suplido.) No obstante, el Tribunal Supremo español ha aclarado que ello no puede operar en pequicio de derechos adquiridos, pues la misma Constitución impide que dicha norma tenga “trascendencia confiscatoria”. STS de 10 de junio de 1996 (RJ 1996, 4752).

(30) Debemos señalar que es incontrovertible que las leyes, ordenanzas y reglas administrativas españolas antes discutidas mantuvieron su vigencia en Puerto Rico luego del cambio de soberanía en 1898, por mandato expreso de la See. 8 de la Ley Foraker, supra.

(31) De hecho, el Tribunal Supremo de España resolvió en una sentencia emitida el 6 de marzo de 1897 que la Ley de Puertos de 1880, por referirse en su totalidad a una materia especial, no fue derogada por el Código Civil. S.TS de 6 de marzo de 1897, Jurisprudencia Civil, Colección completa de las sentencias dictadas por el Tribunal Supremo, Tomo 81, Madrid, 1897, pág. 439.

(32) A pesar de que la enumeración provista por la esa disposición no era de carácter taxativo, lo cierto es que en Rubert Armstrong v. E.L.A., supra, pág. 631, enfatizamos que el artículo “no mencionaba los manglares ni marismas como tal” para fundamentar la naturaleza patrimonial de los terrenos en controversia.

(33) por 0tr0 iac}0) e) tratadista español Sabino Alvarez Gendin postula que los bienes comunes y los bienes de dominio público no se diferencian en prácticamente nada, salvo que existe mayor facilidad para que los bienes de dominio público se transformen jurídicamente en bienes patrimoniales. S. Alvarez Gendin, El dominio público, Barcelona, Ed. Bosch, 1956, pág. 208. De hecho, tanto los bienes comunes como los bienes de dominio público son inalienables, imprescriptibles e inembargables, mientras no pierdan su clasificación demanial o “en tanto que dura su afectación”. Véanse: Figueroa v. Municipio de San Juan, 98 D.P.R. 534, 563 (1970); E.LA. v. Tribunal Superior, supra, pág. 671; Q.M. Scaevola, Código Civil, Madrid, Ed. Reus, 1965, T. XXXII, Vol. 1, págs. 359, 361 y 364; J. Castán, Derecho Civil Español, Común y Foral, lOma. Ed. Madrid, Ed. Reus, 1962, T. I, Vol. 2, pág. 839. De otra parte, la propia doctrina científica de Louisiana apunta a que los códigos civiles modernos, como el de Alemania y España, obran correctamente al prescindir de referencia alguna a los bienes comunes, pues se entiende que la clasificación legal — y no sus características *558 inherentes — debe ser el factor determinante al pasar juicio sobre la susceptibilidad patrimonial de las cosas. 2 Yiannopoulos’s La. Civ. L. Treatise: Property 4th Sec. 46; Staudinger-Dilchr, Kommentar zum burgerlichen gesetzbuch mit einfuhrungsgesetz, 12ma ed., Berlin, Ed. Schweitzer Verlag, 1980, Sec. 90, Anot. 27.

(34) Por otro lado, El Art. 341 del Código Civil español — aplicable en Puerto Rico desde 1890 hasta 1902 — establecía que “los bienes de dominio público, cuando dejen de estar destinados al uso general o a las necesidades de la defensa del territorio, pasan a formar parte de los bienes de propiedad del Estado”. Por lo tanto, es evidente que el fortín y sus terrenos aledaños eran bienes de dominio nacional y público conforme al estado de derecho español. No obstante, el propio Código Civil presentaba su desafectación cuando cesara el uso militar, en cuyo caso pasarían a ser bienes patrimoniales del Estado.

(35) No se deben confundir los bienes comunes — que en su generalidad universal y humanística no pueden ser objeto de apropiación (el aire, el viento y el mar) — con los bienes de dominio público “por su naturaleza”. Estos últimos, aunque singular y técnicamente podrían ser susceptibles de apropiación (un metro cuadrado del mar litoral o el cauce de un río), el estado de derecho lo impide por mandato de la ley. Véanse: M. Hauriou, Precis de Di-oit administratif et Droit public, Paris, Dalloz-Sirey Eds., 1914, pág. 665, citado en S. Martín Retortillo, Aguas Públicas y Obras Hidráulicas, Madrid, Ed. Tecnos, 1966, págs. 231-232.
En conformidad con lo anterior, el Art. 449 del Código Civil de Louisiana, en referencia a los bienes comunes, se refiere a los bienes que no son susceptibles de apropiación por su naturaleza abundante y universal, como el aire y el alta mar (“high seas”), y no al mar litoral. De hecho, el mar litoral, las aguas navegables y los terrenos sumergidos bajo éstas se enumeran en el Art. 450 de dicho Código como bienes públicos que le pertenecen al Estado en su capacidad pública, precisamente, por su naturaleza susceptible de apropiación particular: “Public things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore”. Art. 450 (3 Lsa. Civ. Code 26 (1980).

(36) Es menester señalar que el concepto jurídico del mar, como bien común de la humanidad, tiene su origen en el derecho romano, por lo que fue posteriormente adoptado en la tercera partida del Rey Alfonso el Sabio e incorporado marginalmente en las leyes hídricas decimonónicas en referencia al carácter demanial del mar litoral. Rubert Armstrong v. E.LA., supra, pág. 617. No obstante, debemos aclarar que, conforme al derecho internacional público, este concepto se refiere a los fondos marinos y submarinos situados fuera de la jurisdicción de los estados. Véanse las Resoluciones Núms. 2749 y 2750 del XXV período ordinario de la Asamblea General de las Naciones Unidas, en 1970. Véase, además, A. Vázquez Arrizosa, El Nuevo Derecho del Mar, Bogotá, Ed. Ttemis, 1976, págs. 192-193. En el caso de Puerto Rico, la jurisdicción sobre sus mares se extiende a tres millas náuticas. 94 Stat. 91, 48 U.S.C. see. 749.

(37) Más aún, existe un consenso entre los tratadistas españoles de que —a la luz del Código Civil y la Ley de Puertos de 1880— si se retira el mar surge una nueva zona marítimo-terrestre, convirtiéndose el espacio libre en un terreno sobrante que puede quedar desafectado y transformado en un bien patrimonial. Al respecto, García de Enterría comenta que la extensión de la zona marítimo-terrestre:
“... dependerá, en cada momento, con relación a la misma parcela de terreno, de la situación del mar, que no es siempre la misma, sino variable, según el movimiento de la arena de los fondos, según la erosión, el aluvión, etc.....Debe entenderse que estos espacios libres son terrenos perfectamente patrimoniales, en cuanto a que han perdido su calidad de zona marítimo-terrestre ...”. E. García de Enterría, Dos estudios sobre la usucapión en derecho administrativo, Madrid, Ed. Tecnos, 1974, pág. 120.
Véanse, además: L. Diez-Picazo, Estudios sobre la Jurisprudencia Civil, Madrid, Ed. Tfecnos, 1969, Vol. II, págs. 39-40; Garrido Falla, en M. Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. Edersa, 1980, T. V, Vol. 1, pág. 85; S. Alvarez Gendin, op. cit., págs. 79-83; F. Sainz Moreno, Dominio público estatal de las playas y zona marítimo-terrestre, 99 Rev. Adm. Pública 201, 237-239 (1982).

(38) Nótese que la Ley de Muelles y Puertos de 1928 no derogó en su totalidad la Ley de Puertos de 1886, pues este Tribunal ha resuelto que las leyes portuarias aprobadas con posterioridad a dicha legislación decimonónica deben interpretarse conjuntamente para determinar si las disposiciones de la primera aún son aplicables. Director I.C.P. v. Fitzgerald, etc., supra.

(39) De hecho, en Director I.C.P. v. Fitzgerald, etc., supra, aclaramos que las leyes de puertos posteriores a la Ley de Puertos de 1886, incluyendo la Ley de Muelles y Puertos de 1928, “solamente reglamentan el servicio de muelles y puertos de la isla”, sin regular asuntos sustantivos sobre la titularidad de los bienes aledaños a la costa. De otra parte, este Tribunal ha expresado que “[l]a intención del legislador en dicha disposición no fue otra ... que prohibir, a menos que se haya obtenido un permiso escrito del Comisionado del Interior, la construcción, en las orillas de los puertos, bahías o radas, y en los terrenos públicos que forman la zona marítima y en los terrenos agregados a ella o ganados al mar”. (Énfasis suplido.) Pueblo v. Del Valle, 60 D.P.R. 184, 189 (1942).

(40) por j0 tarLt0> es innecesario examinar el alcance de la definición de zona marítimo-terrestre que se desprende de la referida legislación de 1968, pues dicha ley especial no aplica al caso de autos.

(41) Véase, por ejemplo, Balzac v. Registrador, 51 D.P.R. 757, 759 (1937). Véase, además, Garrido Falla, en Albaladejo, op. cit., págs. 56-57; A. Guaita, Derecho administrativo: aguas, montes, minas, 2da ed., Madrid, Ed. Civitas, 1986, págs. 24-34; García de Enterría, op. cit., pág. 117.

(42) Por otro lado, se ha postulado que tanto la afectación como la desafectación de las cosas al uso público resultará simplemente de las puras circunstancias de hecho del uso, o del no uso, sin precisión alguna de fórmulas sacramentales. García de Enterría, op. cit., pág. 101.

(43) Asimismo, se ha reconocido que la Ley de Aguas y la Ley de Puertos exponían la desafectación por la “consumación de efectos”. García de Enterría, op. cit., pág. 115. Los terrenos ganados al mar no son necesariamente espacios naturales de la zona marítimo-terrestre, pues las obras de relleno o de desecación producen una transformación de las características físicas y naturales que pueden excluir al predio rescatado de la mencionada definición jurídica. A modo ilustrativo, la Ley de Costas española de 1988 reconoce esta característica particular de los terrenos ganados al mar en su disposición transitoria segunda, la cual garantiza los derechos adquiridos sobre ellos si existe un título administrativo suficiente. Así, pues, se excluyen los terrenos rellenados bajo propiedad particular del régimen de expropiación en la zona marítimoterrestre presentado por el estado de derecho español introducido por la Constitución de 1978 y la Ley de Costas de 1988. Desdentado Daroca, op. cit., págs. 62-63.

(44) De hecho, este Tribunal resolvió una demanda sobre la titularidad de unos terrenos ganados al mar a favor del Estado y contra la persona que rescató los terrenos sumergidos mediante la desecación y relleno de manglares, pues tales actos fueron voluntarios y no se demostró “que estuvieran autorizados por el Estado Español”. El Pueblo v. Dimas et al., 18 D.P.R. 1061 (1912). Véase, además, a modo ilustrativo, la Sentencia de 23 de marzo de 1972, Aranzadi Núm. 1562, en la que el Tribunal Supremo de España expresó que “[l]os terrenos ganados al mar como consecuencia de obras construidas por particulares competentemente autorizados serán propiedad de quien las hubiere ejecutado, principio sancionado por la jurisprudencia de todos los tiempos”.

(45) A su vez, el Comisionado del Interior fue posteriormente sustituido por el Secretario de Obras Públicas. Ley Núm. 6 de 24 de julio de 1952.

(46) Para ello, cita al Tribunal Supremo de Louisiana en State ex rel. Guste v. Board of Com’rs, etc., 456 So.2d 605 (1984), y sugiere que adoptemos su raciocinio normativo. No obstante, es evidente que dicha analogía es totalmente improcedente e inaplicable al contexto puertorriqueño, pues ese caso se refiere específicamente a varias enmiendas constitucionales aprobadas en Louisiana en la primera mitad del siglo XX, cuyo propósito era conceder un mandato amplio a las agencias pertinentes para realizar varias obras de dragado y relleno a título patrimonial. Lo que, en esencia, sugiere el Procurador General al citar la jurisprudencia de ese estado es que la desafectación de los terrenos ganados al mar requiere de una enmienda constitucional que sea clara y expresa, en cuanto a su intención de desafectar dichos bienes o de transferir su titularidad.

(47) Para fundamentar esta teoría, el Procurador General indica que la desafectación no puede darse “arbitrariamente o sólo mediante la determinación del funcionario o de la entidad que tenga su custodia”, pues alega que será necesario que la inutilidad suija de fenómenos naturales, o que medie un acto legislativo declarando el cese de tal inutilidad. Godreau y Giusti, op. cit., pág. 563. Para sustentar esta premisa, se refiere al Art. VI, Sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. La citada cláusula constitucional requiere que la enajenación de las propiedades del Estado y el desembolso de fondos públicos se haga para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado. Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006). Sin embargo, esta cláusula constitucional no regula la clasificación jurídica o posible desafectación de los bienes de dominio público. Véase Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144 D.P.R. 1 (1997).
*570 Este Tribunal ha establecido que los bienes de dominio público no son susceptibles de enajenación ni posesión privada, por lo que el Estado no puede disponer de ellos mientras mantengan tal carácter. Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181. 292 (1993); Rubert Armstrong v. E.L.A., supra, pág. 616; Ortiz Carrasquilla v. Municipio de Naguabo, supra, pág. 369; Balzac v. Registrador, supra, pág. 759. Además, nótese que todas las enajenaciones en cuestión se hicieron mediante el Hotel Development Corporation, que ya ostentaba la propiedad privada de estos terrenos conforme a la Ley Núm. 10 de 18 de junio de 1970 (23 L.P.R.A. sec. 671(m)), la cual autoriza el traspaso de bienes públicos y patrimoniales del Estado a la Compañía de Turismo para los fines que dicha corporación pública estime necesarios o convenientes.

(48) Por otro lado, es menester señalar que el uso y destino públicos del predio previamente sumergido cesó inmediatamente tras ser rescatado del mar, pues surge del expediente que el Condado Bay Parcel fue utilizado para ampliar el Caribe Hilton y para crear un área de estacionamiento privado bajo la administración del hotel.

(49) El Procurador General alega que a lo largo del siglo XX la Asamblea Legislativa entendió necesario emitir legislación específica para enajenar terrenos sumergidos y terrenos ganados al mar. No obstante, se deduce del historial legislativo, de los pocos ejemplos que nos presenta, que el propósito de dichas leyes era aclarar la incertidumbre sobre la titularidad que ostentaban varias agencias sobre algunos predios enclavados en la zona-marítimo terrestre, establecer servidumbres de acceso a la playa e, incluso, eximir a varios hoteles de la servidumbre de vigilancia litoral requerida para terrenos de esta índole. Ese fue el caso de la Ley Núm. 25 de 2 de agosto de 1990 (1990 (Parte 1) Leyes de Puerto Rico 100) en cuanto al Hotel El Conquistador, y la Ley Núm. 3 de 22 de agosto de 1990 en referencia a unos predios del Hotel Condado Beach, el Centro de Convenciones y el Hotel La Concha. A pesar de lo anterior, no hemos encontrado ley alguna para desafectar los terrenos rellenados en el litoral de la bahía en los que hoy se asientan las comunidades mencionadas.

(50) por ejempi0¡ el Gobierno de Puerto Rico le garantizaba una parcela a toda persona que colaborara en los rellenos de las áreas manglares de Puerta de Tierra. El plan urbanístico diseñado por el Estado consistía en la desecación y el relleno de todas las áreas de manglares al margen de la bahía. Este plan incluía los canales de San Antonio y Martín Peña, las áreas de Las Monjas en Hato Rey y el sector entre el canal de San Fernando, Cataño y Bayamón. Véase “La Bahía de San Juan: La desecación de los manglares”, en el periódico El Mundo, 25 de octubre de 1920, pág. 3, citado en Seguinot Barbosa, supra. Este proyecto urbano de rellenos respondía a que la creciente demanda por espacios para la construcción obligó al Estado a vender en subasta pública terrenos manglares y pantanosos. Id., págs. 66-67. Cónsono con dicha *575 política pública, de 1930 a 1950 se realizaron varios rellenos de la antigua ciénaga de Maehuchal, para desarrollar- las comunidades de Ocean Park y Punta Las Marías. Asimismo, se rellenó un sector de la orilla norte del Caño Martín Peña para ampliar la comunidad de Barrio Obrero. Sepúlveda y Carbonell, supra, págs. 48 y 60. De otra parte, el gobierno federal llevó a cabo un relleno inmenso de los alrededores de la bahía de San Juan en las áreas de manglares al sur del canal de San Antonio, Isla Grande y la isla Mii-aflores con material proveniente de la bahía, en el sector donde se construyó el aeropuerto Isla Grande y en el que hoy ubica el Centro de Convenciones.